**MCA INC., and Universal City Studios, Inc., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. CV 78–1453–RJK.**

United States District Court, C. D. California.

May 28, 1980.

Donovan, Leisure, Newton & Irvine, John Cooley Baity, Los Angeles, Cal., for plaintiffs.

Andrea Sheridan Ordin, U. S. Atty., Charles H. Magnuson, Asst. U. S. Atty., Chief Tax Div., Mason C. Lewis, Asst. U. S. Atty., Los Angeles, Cal., Gilbert W. Rubloff, Atty., Dept. of Justice, Tax Div., Washington, D. C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

This is an action for refund of federal income taxes in the amount of $868,170 brought by MCA Inc. and Universal City Studios, Inc., against the United States with respect to plaintiffs' tax liability for calendar years 1972 and 1973. The matter is before the Court on the parties' cross motions for summary judgment.

The issue presented for determination by the Court is whether the local outlets established by plaintiffs in foreign countries to handle distribution of plaintiffs' films abroad are to be classified as partnerships or as corporations for U. S. income tax purposes.

### I. *FACTUAL BACKGROUND*

The parties agree that no genuine issue exists as to any material fact in this action, and hence the matter is ripe for summary judgment on the basis of the parties' cross motions. In brief, this action arises from defendant's decision to increase plaintiffs' 1972 and 1973 taxable income by treating certain of plaintiffs' foreign film distribution outlets as corporations rather than partnerships for U.S. income tax purposes. Plaintiffs' position is that the foreign film distribution outlets are partnerships under applicable U. S. tax rules.

The Pre–Trial Conference Order as signed contains a complete and detailed recital of the facts relevant to the determination of whether plaintiffs' local distribution outlets in foreign countries are to be treated as corporations or partnerships within the meaning of U.S. tax laws. Plaintiffs are major domestic producers of theatrical motion picture films which are regularly

distributed throughout the world. In the late 1960's, plaintiffs and Paramount Pictures Corporation, another international motion picture company, determined that the most efficient and economical means of distributing their films abroad was by means of a joint venture. Therefore, in 1970, plaintiffs and Paramount formed Cinema International Corporation, N.V. (hereinafter "CIC"), a Dutch corporation with principal offices in Amsterdam.

The distribution of theatrical films involves extensive marketing and service activities which must be largely conducted within the foreign country in which the films are being exhibited. Plaintiffs therefore recognized that CIC could not operate its world–wide film distribution business solely from CIC's offices in Amsterdam. Hence, a network of local distribution outlets was established to service individual foreign countries. These outlets distribute the films in their respective geographic territories, performing such tasks as importing, checking, storing, and distributing film prints, arranging for advertising and promotion of films, and all other aspects of local film distribution. Operation through branch offices of CIC was not a feasible alternative because of the commercial need to establish a permanent and separate presence in each country and because in many nations branch offices of a foreign corporation are prevented from engaging in film distribution, receive unfavorable film quotas, are ineligible for membership in the local film board, and face difficulties in compliance with local law and regulations.

The parties agree that the professional advisers were instructed to form the local distribution outlets in such a way as to make them independent taxable entities and to draft the organizational documents of the outlets in a manner designed to avoid inclusion of the four characteristics establishing "corporateness" within the meaning of Treasury Regulations Section 301.7701–2 and –3.

Paramount and plaintiffs each own 49 percent of CIC's stock, with the remaining two percent interest being held by Stichting CIC Employees Trust Fund, a Netherlands employee benefit trust. Similarly, with one exception, each of the local distribution outlets is owned 95 percent by CIC and five percent by Proetus, B.V., another Dutch corporation which is wholly owned by Stitching. CIC operates under Articles of Association which resemble articles of incorporation. CIC's business operations are directed by a board of directors which is made up of an equal number of representatives from plaintiffs and Paramount. CIC policy is determined through discussions at meetings of the board of directors. Plaintiffs' representatives on CIC's board are chosen by Lew R. Wasserman, acting in his capacity as Chairman of the Board and Chief Executive Officer of plaintiffs. Paramount's counterpart to Wasserman on the CIC board is Charles G. Bluhdorn. Wasserman and Bluhdorn also serve as trustees of Stichting (and jointly appoint a third trustee), which owns the remaining two percent of CIC (in addition to the respective 49 percent shares held by plaintiffs and Paramount) and which indirectly controls, by way of ownership of Proetus, the remaining five percent of the local distribution outlets. Finally, like CIC, Proetus operates under Articles of Association, with its business operations conducted by its two managing directors who are salaried employees of CIC. Proetus's managing directors are obligated to follow, and did follow, the directions of the trustees of Stichting.

## II. *"CORPORATION" VERSUS "PARTNERSHIP"*

■ CIC is a "controlled foreign corporation" within the meaning of Section 957(a) of the Internal Revenue Code of 1954, which means that, to the extent its earnings constitute "Subpart F income," its income is includible to the taxable income of its U.S. shareholders–plaintiffs and Paramount. A "controlled foreign corporation" means any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock is owned by U.S. shareholders on any day during the taxable year of such foreign corporation. This action involves interpretation and application

of Sections 951 *et seq.* of the Internal Revenue Code of 1954, known as the "Subpart F" provisions. As the government points out, until the enactment of the Subpart F provisions in 1962, it was possible for U.S. business enterprises to operate abroad through foreign corporations and to thereby avoid or indefinitely defer imposition of U.S. tax on the income earned by such foreign corporations. No U.S. income tax was imposed on such earnings until these foreign corporations paid dividends to their U.S. shareholders. Subpart F was enacted to limit this practice by including in the taxable income of U.S. shareholders certain income—namely, "Subpart F income"—of their controlled foreign corporations, whether or not such earnings were actually distributed to the U.S. shareholders—known as "repatriation."

Throughout the period relevant to this suit, CIC was a "controlled foreign corporation" within the meaning of Section 957. Therefore, to the extent its earnings constitute "Subpart F income" plaintiffs concede that their pro rata share of such revenue earned by CIC is includible in their taxable income. *See* Section 951(a). "Subpart F income" is defined in Section 952(a) to include "foreign base company income" which, in turn, includes "foreign personal holding company income" (as set forth in Section 954(a)). Section 553 and 954(c) provide that all rents and royalties are considered "foreign personal holding company income" whenever they are received from a "related person," as defined by Section 954(d)(3). Section 954(d)(3) provides that an entity is a "related person," with respect to a foreign controlled corporation, if * * * (B) such person is a *corporation* which * ↑ * is controlled by * * * the controlled foreign corporation; or (C) * * * is a corporation which is controlled by the same person or persons which control the controlled foreign corporation." [Emphasis supplied.] "Control" is defined as "the ownership, directly or indirectly, of stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote."

The principles just outlined are applicable to the factual context at hand in the following fashion. No dispute exists that plaintiffs, along with Paramount, control CIC which, in turn (together with the Trust), control the local distribution outlets in the various foreign countries. The parties agree that if these local distribution outlets are treated as *partnerships,* CIC's income received from the outlets is not subject to U.S. income taxation until such income is repatriated to the United States; such a finding by the Court would mean that plaintiffs would be entitled to the full amount of refund of federal income taxes sought. Such a reduction in tax liability arises because if the local distribution outlets are partnerships, (a) they are not "related persons" with respect to CIC, and (b) CIC's partnership share of the outlets' income is deemed to derive from the unrelated persons (namely, the third party film exhibitors in the various foreign countries) with whom the local outlets transact business. On the other hand, if the local distribution outlets are deemed to be *corporations,* the outlets are "related persons" with respect to CIC, and accordingly, all of the income CIC receives from the local outlets is "Subpart F income" which is includible in the taxable income of plaintiffs; such a finding by the Court would mean that plaintiffs should be denied any tax refund, and summary judgment should be awarded in favor of defendant.

Section 7701(a)(2) defines a "partnership" to include "a syndicate, group, pool, joint venture, or other incorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; * * * ." The applicable Treasury regulations promulgated pursuant to this section provide that the tests, or standards, which are to be applied in determining whether an organization is a corporation or a partnership are controlled by the Internal Revenue Code. Treas.Reg. § 301.-7701–1(b). Thus, as the government points out, classification of a particular entity for income tax purposes is not controlled by the

local law of the jurisdiction in which the entity was formed, or in which it operates, nor is the name used determinative. Treas. Reg. § 301.7701–1(c). However, the regulations state that "although it is the Internal Revenue Code rather than local law which establishes the tests or standards which will be applied in determining the classification in which an organization belongs, local law governs in determining whether the legal relationships which have been established in the formation of an organization are such that the standards are met. Thus, it is local law which must be applied in determining such matters as the legal relationships of the members of the organization among themselves and with the public at large, and the interests of the members of the organization in its assets." § 301.7701–1(c).

Treas.Reg. § 301.7701–2, which sets forth the characteristics of "corporations," holds that an organization will be treated as a corporation if its characteristics are such that it "more nearly resembles a corporation than a partnership or trust." Treas. Reg. § 301.7701–2, as interpreted in *Larson v. Commissioner*, 66 T.C. 159 (1976), *acquiesced in*, 1979 I.R.B. 6, provides that a business organization which has associates and an objective to carry on business and divide the gains therefrom is to be treated as a "corporation" for U.S. income tax purposes if the organization has *three* of the four following characteristics of "corporateness": (1) continuity of life [§ 301.7701–2(b)]; (2) centralization of management [§ 301.7701–2(c)]; (3) limited liability [§ 301.7701–2(d)]; (4) free transferability of interests [§ 301.7701–2(e)].

### A. Continuity of Life

Treasury Regulation § 301.7701–2(b) states that "[a]n organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization." Conversely, if any one of these factors *does* cause dissolution of the organization, then "continuity of life" is *not* present. "Dissolution" of an organization is defined as "an alteration of the identity of an organization by reason of a change in the relationship between its members as determined under local law." Treas.Reg. § 301.7701–2(b) also notes that a corporation has "a continuing identity which is detached from the relationship between its stockholders." Accordingly, the death or bankruptcy of a shareholder, or the sale of a shareholder's interest, has no effect "upon the identity of the corporation and, therefore, does not work a dissolution of the organization."

No dispute exists that "the organizational documents and foreign law governing the following local distribution outlets provide for dissolution on the happening of specified events, including the bankruptcy of a member: Argentina, Austria, Belgium, Brazil, Colombia, Germany, Guatemala, Italy, Mexico, Panama, Peru and Venezuela."

### B. Centralization of Management

Under Treasury Regulation § 301.7701–2(c), an organization is deemed to have centralized management "if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed. Therefore, the persons who are vested with such management authority "resemble in powers and functions the directors of a statutory corporation." "Centralized management" is further defined to mean "a concentration of continuing exclusive authority to make independent business decisions on behalf of the organization which do not require ratification by members of such organization." Conversely, no centralized management exists when the centralized authority is merely to perform ministerial acts as an agent at the direction of a principal."

The crucial element here is the concentration of necessary operating authority in the hands of a particular group, unlike the "mutual agency" relationship of a partnership wherein each member can bind the organization by his acts within the business. No dispute exists that "[t]he organizational documents and foreign law governing the

following local distribution outlets give each member [of the organization] acting alone, the power to manage and to bind the outlet by such member's acts: Argentina, Australia, Belgium, Brazil, Colombia, France, Germany, Guatemala, Hong Kong, Israel, Italy, Lebanon, Mexico, New Zealand, Panama, Peru, South Africa, Trinidad, the United Kingdom and Venezuela."

### C. Limited Liability

Under Treasury Regulation § 301.7701–2(d), an organization has the corporate characteristic of "limited liability" if under local law there is no member who is personally liable for the debts of or claims against the organization." "Personal liability" means that "a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim."

No dispute exists that "[t]he organizational documents and foreign law governing the following local distribution outlets provide for unlimited liability for all members [of the organization]: Belgium, Hong Kong, Israel, Lebanon, New Zealand, South Africa, Trinidad and the United Kingdom ... [and] the following local distribution outlets have limited liability for all members: Argentina, Australia, Austria, Brazil, Colombia, France, Guatemala, Italy, Mexico, Panama, Peru and Venezuela."

### D. Free Transferability of Interests

Under Treasury Regulation § 301.7701–2(3), an organization has the corporate characteristic of "free transferability of interests" if "each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of the other members, to substitute for themselves in the same organization a person who is not a member of the organization." In order for this power of substitution to exist in the corporate sense, "the member must be able, without the consent of other members, to confer upon his substitute all the attributes of his interest in the organization." Furthermore,

the powers of substitution and free transferability of interest do not exist "if under local law a transfer of a member's interest results in the dissociation of the old organization and the formation of a new organization."

No dispute exists that "[t]he organizational documents and foreign law governing the following local distribution outlets provide that no member may transfer, pledge or in any way burden its interest in the outlet without the approval of the other member: Argentina, Australia, Austria, Belgium, Brazil, France, Germany, Guatemala, Hong Kong, Israel, Italy, Lebanon, Mexico, New Zealand, Panama, South Africa, Trinidad and the United Kingdom."

### E. Summary

According to the Pre–Trial Order, "[t]he parties believe that the status as partnerships or corporations for U. S. income tax purposes is the same for all of the local distribution outlets [discussed above]." Cumulating the corporate characteristics of each foreign distribution outlet listed above, one finds that each of plaintiffs' twenty-one local distribution outlets in the various foreign countries possesses two or fewer of the four characteristics of "corporateness." Treasury Regulation § 301.7701–2(a)(3) provides that "[a]n unincorporated organization shall not be classified as an association [namely, as a corporation for income tax purposes] unless such organization has more corporate characteristics than noncorporate characteristics." In other words, for the local distribution outlets at issue here to be deemed "corporations," as opposed to "partnerships," each outlet must have at least three of the four corporate characteristics. None of these outlets—on its face in accordance with the four nominal or formal characteristics of "corporateness" listed above—has the requisite number of features to be deemed a corporation. However, life does not end here, for the government argues that these local distribution outlets are in fact structured and operated in a manner which so closely parallels that of a corporation as to defeat their nominal characterization as "partnerships."

### F. Government's "Lack of Separate Interests" Theory

The government's basic contention is that, while the local outlets are made to appear as if they are owned and controlled by two separate interests, CIC and Proetus, there is no meaningful possibility that either of these interests would ever act independently of the other. As noted above, plaintiffs, together with their joint venturer Paramount, owned 98 percent of CIC which, in turn, owned 95 percent of each of the local distribution outlets at issue here. In addition, Bluhdorn as representative of Paramount and Wasserman as representative of plaintiffs are two of the three trustees of Stichting CIC Employees Trust—the third trustee being appointed by these two others—which controls 100 percent of Proetus which, in turn, controls the remaining 5 percent of each local distribution outlet.

In brief, then, the government maintains that plaintiffs and their joint venturer Paramount are in actual control of both CIC (95 percent interest in each outlet) and the Stichting CIC Employees Trust (5 percent interest in each outlet), and hence CIC and the Trust are not separate partners with separate and independent interests in the local distribution outlet. Thus, the government contends that it would be difficult to foresee any circumstance in which Bluhdorn and Wasserman as trustees of the Employees Trust would find it necessary to act in derogation of the interest of CIC (on whose board they serve) with regard to the local outlets.

Plaintiffs respond that the trustees of the Employees Trust are responsible as fiduciaries to the trust beneficiaries, not to CIC or its shareholders. Accordingly, plaintiffs contend, to treat Bluhdorn and Wasserman in their respective director (of CIC) and trustee (of the Employees Trust) capacities as a single interest presumes that in the event of a conflict between the two roles, Bluhdorn and Wasserman would violate their fiduciary duties to employee–beneficiaries of the Trust. However, this argument is unpersuasive: in the event of a conflict between these respective roles as director and trustee, Bluhdorn and Wasserman would always be faced with the choice of either violating their fiduciary responsibilities as trustees of the Trust or violating their fiduciary responsibilities as directors of CIC.

The manner in which the Trust, CIC, and the local outlets are structured indicates an intent to create the appearance that the outlets are owned by separate and independent partners when, in fact, the operations of the Trust and CIC are sufficiently interwoven as to cast doubt on their separateness and independence. The financial statements of the Trust indicate that its sole assets are CIC and Proetus stock. As discussed more fully below, CIC and Proetus have rights of "first refusal" with regard to any sale of their respective stock by the Trust. Two of the three trustees of the Trust were appointed by the board of directors of CIC (of which Bluhdorn and Wasserman were members), with the third trustee being chosen by the other two. A majority vote of two out of three trustees control Trust operations. From 1971 through 1975, years which include the period in question here, either Wasserman or Bluhdorn served as chairman of the board of trustees of the Trust. The meetings of the trustees were normally held either immediately before or after the board meetings of CIC. These meetings were generally held in a hotel room or lobby where the CIC board had met and lasted less than an hour.

The presence of Proetus does not alter the fact that the Trust is the true owner of the five percent share in the local outlets. Proetus is wholly–owned by the Trust. Proetus was created merely because some of the foreign countries in which the local outlets operated do not recognize the Trust as a legal entity. Finally, Proetus is operated by CIC employees who act solely at the behest of the trustees of the Trust.

In support of their "two hat" theory of Bluhdorn's and Wasserman's dual roles as trustees of the Trust and directors of CIC, plaintiffs maintain that Bluhdorn and Wasserman are bound by Netherlands law to

adhere to the terms of the Trust, and hence the Trust should be deemed independent from, and uncontrolled by, CIC. However, examination of the terms of the Trust agreement reveals that the trustees have enormous discretion in the operation of the Trust. According to Article 10 of the Trust, it is the "duty of the Board to hold, to invest and to reinvest the capital in such manner *as they in their sole discretion may determine*." [Emphasis supplied] Further, under Article 11, "[t]he Board shall invest and reinvest the capital and hold the capital invested, without distinction between principal and income, in such securities and other property, real or personal, of any kind, including bonds, notes, debentures, and common and preferred stocks *as the Board may deem proper and suitable, irrespective of any law or rule of court limiting or restricting the investment of trust funds*." [Emphasis supplied] Finally, Article 13 contains the following rather cryptic language:

> "The Board of Trustees is authorized and empowered *a.* to sell, exchange, convey, transfer or otherwise dispose of any property held by it, by private contract or at public auction, and no person dealing with the Board of Trustees shall be bound *to see to the application of the purchase money or to inquire into the validity, expediency or propriety of any such sale or disposition. . . .*" [Emphasis supplied]

Therefore, the trustees have sufficient discretion to operate the Trust in a manner consistent with the aims of CIC.

From 1972 through 1976, the Trust's sole assets were CIC and Proetus stock. Essentially, then, the trustees' duty during this period was to maximize the value of this stock—a duty not inconsistent with the duty of the directors of CIC. In addition, it was in CIC's interest to exercise control over the operation of the Trust by means of the interlocking directorate. The Trust's holdings of CIC stock represents a two percent share of ownership of CIC, with Paramount and plaintiffs each holding a 49 percent interest in CIC. Thus, the Trust's two percent share in CIC would be of crucial importance if a deadlock arose between Para-

mount and plaintiffs, the 49 percent shareholders. The directors of CIC (as representatives of Paramount and plaintiffs) would never want the "control" represented by this two percent share to pass into the hands of an outsider who would then intervene into CIC policy and destroy the character of CIC as a joint venture between Paramount and plaintiffs. Similarly, by vesting the Trust with the five percent ownership of each outlet—rather than with a local partner—outside interference in the operation of the local outlets is avoided.

Therefore, if it were in the interest of the Trust to sell its CIC and Proetus stock, two outcomes would be possible. First, CIC and Proetus could exercise their rights of first refusal to repurchase their respective stock. Second, Bluhdorn and Wasserman, as the two controlling votes of the Trust, could simply refuse to even initiate the sale. As to the first avenue, Article 13 of the Trust provides an elaborate system of clearances which the Trust must gain from CIC and Proetus before any sale of such stock may be made to outsiders. The Trust must first make a written offer to CIC (for the sale of CIC stock) at a price determined under a formula in the trust agreement. Even if CIC refuses this offer, and the Trust thereafter receives a bona fide offer from a third party, CIC again has the opportunity to match this outside offer and to purchase the stock. Finally, even if CIC again refuses to repurchase the stock, the sale to the outsider must be consummated within sixty days of CIC's second refusal, or the trustees will lose their authority to make such a sale. However, if market factors dictated the sale of both CIC and Proetus stock, Bluhdorn and Wasserman—to vindicate their interests as directors of CIC and Paramount and MCA—would likely block the sale of both to prevent ownership of the local outlets from merging together into CIC, thereby destroying the appearance of partnership in the local outlets.

In short, then, while CIC and the Trust may nominally appear to be separate entities, a strong argument can be made that their operations are so interwoven as to

845

represent a single interest. If CIC and the Trust are viewed as a single interest, the government argues, the local outlets must necessarily be viewed as corporations. The government contends that the corporate characteristics of "free transferability of interests" is present because if either CIC or Proetus had wished to sell its interest in a local outlet, the other would not have objected or interfered. Similarly, as to the "continuity of life" if "the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization." The government maintains that if no separate interests exist which would demand termination upon the occurrence of one of these events, then a local outlet might well survive such occurrences—again, as would a corporation.

The government's "lack of separate interests" theory here finds some support in Rev.Rul. 77–214, 1977–1 C.B. 408. This ruling related to a business organization formed under German law and owned by two domestic subsidiaries of the same U.S. parent corporation. Although this German organization's memorandum of association provided that it would be dissolved by the death, insanity, or bankruptcy of a shareholder and that the shares were not freely transferable, the Internal Revenue Service found that the organization nevertheless possessed the corporate characteristics of free transferability of interest and continuity of life and was therefore taxable as a corporation. The Service reasoned that, with respect to the characteristic of free transferability, since the two wholly—owned subsidiaries owned 100 percent of the German organization in question, the parent which controlled the two subsidiaries could make all of the transfer—of—interest decisions for its wholly—owned subsidiaries, despite any provision to the contrary in the German organization's memorandum of association. Secondly, although § 301.7701–2(b)(1) provides that "continuity of life" is absent where an organization is subject to dissolution upon the occurrence of certain events, the Service found this standard to have "significance only if there exist separate interests that could compel dissolution of the organization upon the occurrence of one of the listed events of dissolution." If, the Service reasoned, both shareholders of the German organization were wholly—owned by the same corporate parent, no separate interests were present which would compel dissolution of the German organization should an event of dissolution occur. Because control of the German organization was exercised by a single corporate entity which had the power to dissolve or continue the organization in accordance with its own business objectives, the German organization was deemed to have the corporate characteristic of continuity of life. The statement in its memorandum of association that the death, insanity, or bankruptcy of one of its shareholders would result in dissolution of the organization was deemed to be without "substantive effect" and hence was disregarded in the determination of the presence of continuity of life.

Application of the 1977 revenue ruling to the facts at hand seems to require some extension of its basic reasoning. The gist of the ruling is that the partnership interests of two subsidiaries are deemed identical interests, rather than separate interests, where the subsidiaries are owned by a single corporation having a single interest in the assets and business of both subsidiaries. Here, the argument would be that CIC and the Trust, although nominally separate, are in fact subject to common control. Therefore, the interests of CIC and the Trust in the local outlets being identical, the interests merge, and the corporate characteristics of continuity of life and free transferability of interest are present. Plaintiffs seek to distinguish the 1977 ruling on the ground that there the parent corporation had a single beneficial interest in both subsidiaries, whereas here the beneficial owners of the partnership interest in the local outlets held by the Trust are the Trust beneficiaries, not CIC or its shareholders. However, given the trustees' wide discretion to manage the Trust, and extent of CIC's control over the affairs of the Trust, plaintiffs' arguments lose force. The trus-

tees have effectively insulated themselves from any challenge to their decisions by the beneficiaries.

In response, plaintiffs rely upon Rev.Rul. 75–19, 1975–1 C.B. 382, an earlier revenue ruling which held that a partnership formed under a statute corresponding to the Uniform Partnership Act by a domestic corporation's four domestic subsidiaries, each with business reasons for independent existence outside the partnership, and not to avoid tax, was classified as a partnership for tax purposes. In addition, plaintiffs rely upon Priv.Rul. 7934096 (May 24, 1979) [Private Ruling], which involved a parent corporation with two wholly–owned subsidiaries which, in turn, jointly owned another organization. This latter organization's charter called for dissolution upon certain occurrences, joint and several unlimited liability of the owners, management by all of the owners, and transfer of interests only upon the consent of all owners. The Service ruled that the presence of these various elements in the organization's charter was sufficient to gain the classification of partnership for tax purposes. Finally, plaintiffs rely upon the formal tests for "corporateness" set forth in the Regulations. The United States Supreme Court has held that "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). Plaintiffs maintain that the express language of the applicable regulations neither explicitly nor implicitly contemplates the imposition of a "separate interests" rule on top of the four criteria for "corporateness."

However, as Justice Holmes observed in *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918), which construed the language of a tax statute: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." So too here, the Court must delve below the mere formal veneer of the so–called "partnership" entity to consider its *actual* structure and manner of operation and decision–making. Taken together, all of the factors discussed above regarding the relationship between CIC and the Trust, the structure of the Trust and its manner of operation, point to the conclusion that CIC and the Trust had an identity of interests with regard to the local distribution outlets and that such outlets were operated in a manner characteristic of corporations. Thus, upon close examination, the partnership veil of the local outlets proves rather evanescent.

In addition to the corporate characteristics of "free transferability of interests" and "continuity of life," a sufficient number of the local outlets possess a third corporate characteristic–"limited liability of members"–for all outlets to be deemed "corporations." As noted above, the following local distribution outlets have limited liability for all members: Argentina, Australia, Austria, Brazil, Colombia, France, Guatemala, Italy, Mexico, Panama, Peru, and Venezuela. The parties agree that, under Section 954(b)(3)(B), the aggregate income which CIC derived from these twelve local outlets is sufficient, in itself, to control the tax treatment of all of CIC's earnings. Under Section 954(b)(3)(B), if more than 70 percent of a foreign corporation's income for a taxable year is Subpart F income then all of the corporation's income for that year is treated as Subpart F income. It is undisputed that more than 70 percent of CIC's income for each of the 1972–1973 years was received from the twelve local outlets listed immediately above.

Therefore, a sufficient number of the local distribution outlets possessing the corporate characteristics of "free transferability of interests," "continuity of life," and "limited liability," all of CIC's income is deemed Subpart F income and, accordingly, summary judgment should be entered in favor of defendant United States of America and against plaintiffs.