**MCA INC. and Universal City Studios, Inc., Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 80–5510.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1981.

Decided Aug. 27, 1982.

---

John Cooley Baity, Donovan, Leisure, Newton & Irvine, Los Angeles, Cal., for plaintiffs-appellants.

Stephen Gray, Washington, D. C., argued, for defendant-appellee; M. Carr Ferguson, Michael L. Paup, Washington, D. C., on brief.

Before PREGERSON, CANBY and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

This appeal presents the question whether unincorporated foreign organizations, jointly owned by a controlled foreign corporation and an employee trust, should be characterized as corporations or partnerships for domestic tax purposes. The Commissioner of Internal Revenue determined that the organizations were corporations, and assessed a deficiency of $868,170 against MCA, an indirect owner of the organizations. MCA paid the deficiency and filed this action for a refund, contending that the organizations are partnerships within the meaning of Treas.Reg. § 301.-7701–2, T.D. 6503, 1960–2 C.B. 413. The district court, 502 F.Supp. 838, acting on cross motions, granted summary judgment for the government. We reverse.

I

In 1970, MCA Inc. and its wholly owned subsidiary, Universal City Studios, Inc. ("MCA") entered an agreement with Paramount Pictures Corporation ("Paramount") to form a joint organization for the distribution of films abroad. Pursuant to the agreement, MCA and Paramount formed a Dutch corporation, Cinema International Corporation ("CIC") and each received 49% of the corporation's stock. The remaining 2% of the CIC stock was used to fund an entity called "Stichting," an employee trust created by MCA and Paramount for the benefit of CIC's top directors. CIC has an eight-member Board of Directors, four elected by MCA and four by Paramount. For the relevant tax years (1972 and 1973), MCA elected its chief executive officer, Mr. Lew Wasserman, and Paramount elected its chief executive officer, Mr. Charles Bludhorn. Messrs. Wasserman and Bludhorn were each given authority to designate three additional directors.

, Stichting has a three-member Board of Trustees. Two Trustees are appointed by the CIC Board of Directors and those two, in turn, appoint the third Trustee. For the relevant tax years, CIC appointed Messrs. Wasserman and Bludhorn, who in turn appointed a Dutch attorney. The Stichting Trustees act by majority vote.

Shortly after Stichting was created, CIC and Stichting jointly established local distribution outlets ("distributorships") in 29 countries.[1] Each distributorship is owned 95% by CIC and 5% by Stichting, and is structured as an independent taxable entity under the applicable foreign laws. In addition, to obtain favorable United States tax treatment, the organizational documents of each distributorship include provisions intended to conform to the partnership requirements of Treas.Reg. § 301.7701–2, T.D. 6503, 1960–2 C.B. 413.

## II

### A

It is undisputed that CIC is a "controlled foreign corporation" within the meaning of I.R.C. § 957(a). Accordingly, all "subpart F" income earned by CIC must be included in the taxable income of CIC's United States shareholders, MCA and Paramount, in the year the income is earned. I.R.C. § 951(a)(1). Subpart F income includes "foreign base company income," I.R.C. § 952(a)(2), which in turn includes all rents and royalties received from "related persons." I.R.C. §§ 954(a)(1) and (c)(3)(A). An entity is a related person with respect to a controlled foreign corporation, "if such [entity] is a *corporation* which ... is con-

trolled by ... the controlled foreign corporation." I.R.C. § 954(d)(3)(B) (emphasis added).

The parties agree that if the distributorships were properly characterized as corporations, the income received by CIC from the distributorships in 1972 and 1973 was subpart F income, taxable to MCA and Paramount in the years earned.[2] They also agree that if the distributorships are partnerships, MCA is entitled to a refund, because non-subpart F income received by CIC is taxable to CIC's United States shareholders only when repatriated in the form of dividends.

### B

■ The tax character of an unincorporated organization is determined by the test prescribed in Treas.Reg. § 301.7701–2, T.D. 6503, 1960–2 C.B. 413.[3] To be classified as a corporation under that test, an organization must possess at least three of four enumerated corporate characteristics: limited liability, centralized management, free transferability of interests and continuity of life.[4] § 301.7701–2(a)(1)–(3). *See Larson v. Commissioner,* 66 T.C. 159 (1976), *acquiesced in,* 1979–1 C.B. 1 (1979). An organization with fewer than three corporate characteristics is treated as a partnership for tax purposes. § 301.7701–2(a)(3). The presence or absence of the corporate characteristics is determined both under the entity's organizational documents and the local laws under which the entity is organized. § 301.7701–2(b)(2), –2(e)(1).

1. Stichting's participation in the distributorships was conducted through Proteus, a corporation wholly owned by Stichting. To avoid confusion, we refer to both Proetus and Stichting as "Stichting" throughout the opinion.

2. If more than 70% of a foreign-controlled corporation's income for a taxable year is subpart F income, all of its income for that year is treated as subpart F income. I.R.C. § 954(b)(3)(B). The parties stipulated that more than 70% of CIC's income for tax years 1972 and 1973 came from twelve distributor- ships: Argentina, Australia, Austria, Brazil, Columbia, France, Guatemala, Italy, Mexico,

Panama, Peru and Venezuela. Thus, for purposes of this case, the tax character of those distributorships only is at stake.

3. The parties stipulated that the test of § 301.- 7701–2 applies to both foreign and domestic entities.

4. Two additional characteristics—associates and a business purpose—are irrelevant to the corporation/partnership distinction, because they are common to both forms of organization. § 301.7701–2(a)(2).

The parties stipulated that the distributorships exhibit the corporate characteristic of limited liability and that they lack the corporate characteristic of centralized management. The parties also stipulated that,[5] under both the organizational documents and the applicable local laws, the distributorships nominally lack the two remaining corporate characteristics: continuity of life, because the organizational documents and local laws provide for dissolution upon the happening of specified events, including the bankruptcy of a member,[6] and free transferability of interests, because the organizational documents and local laws prohibit the transfer or burdening of one member's interest without the consent of the other.[7]

Notwithstanding these stipulations, the government contends that, as a matter of substance, the distributorships have continuous life and freely transferable interests. The government reasons that, although nominally separate organizations, CIC and Stichting represent a single economic interest and that, as a practical matter, Stichting can never act independently of CIC. Thus, the government concludes that the provisions purporting to regulate the relationship between CIC and Stichting, by restricting the transferability of interests and

providing for dissolution of the organization in specified circumstances, have no legal significance.[8]

### III

The IRS first applied its single economic interest theory in Rev.Rul. 77–214, 1977–1 I.R.B. 408. In that ruling, two domestic corporations, each a wholly owned subsidiary of the same domestic parent, had formed under German law an unincorporated entity (denominated a "GmbH") with the corporate characteristics of limited liability and centralized management. The memorandum of association restricted the transferability of interests and provided for dissolution upon the happening of specified events, thus apparently qualifying the GmbH for partnership status under § 301.-7701–2. In its ruling, the IRS opined that, despite the provisions of the memorandum, the GmbH had freely transferable interests, because the controlling parent would make all transfer decisions for its wholly owned subsidiaries; similarly, the GmbH had continuous life, because there were no separate interests to compel dissolution should one of the specified events occur.[9] Thus, the IRS concluded that the GmbH would be classified as a corporation for tax purposes.

**5.** These facts were listed in the pre-trial memorandum under the heading of facts "not admitted [but] not to be contested at trial by evidence to the contrary." For purposes of this opinion, we treat the pre-trial statement as a stipulation of fact.

**6.** The continuity of life factor reflects the fact that a "corporation ... has a continuing identity which is detached from the relationship between its stockholders," while the "personal relation between the partners ... constitutes the identity of the partnership itself." § 301.-7701–2(b)(2); see Larson, 66 T.C. at 173–74. Accordingly, if any enumerated event, including the "death, insanity, bankruptcy, retirement, resignation or expulsion of any member will cause a dissolution of the organization, continuity of life does not exist." § 301.7701–2(b)(1). Moreover, if such an event will cause a technical dissolution of the organization, thereby altering its identity, the organization lacks continuity of life even though the remaining partners may elect to continue the business. Larson, 66 T.C. at 174–75.

**7.** Free transferability of interests exists if each member of an organization, or those members

"owning substantially all of the interests ... have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization." § 301.7701–2(e)(1). There is no free transferability of interests, regardless of any provision in the organizational documents, if, under local law, the transfer of a member's interest will cause a technical dissolution of the organization. § 301.7701–2(e)(1).

**8.** The district court agreed with the government and concluded that "the relationship between CIC and the trust, the structure of the trust and its manner of operation, point to the conclusion that CIC and the trust had an identity of interests with regard to the local distribution outlets and that such outlets were operated in a manner characteristic of corporations." [E.R., Vol. V at 1082].

**9.** Apparently, there were no relevant provisions of German law governing continuity of life or transferability of interests.

## A

We begin our analysis with the recognition that CIC and Stichting, unlike the corporations in Rev.Rul. 77–214, are beneficially owned by parties with separate and distinct economic interests—CIC principally by MCA and Paramount, and Stichting personally by individual employees of CIC. It follows that, whatever the commonality of their business interests, there is a potential for legitimate conflict of interest between them in the management of the distributorships.[10]

The government asserts that despite the separate beneficial ownership of CIC and Stichting, any potential for conflict is hypothetical. The government reasons that CIC and Stichting are subject to the common control of MCA and Paramount, through the dual roles of Messrs. Wasserman and Bludhorn as controlling members of both the CIC Board of Directors and the Stichting Board of Trustees. The government emphasizes that the Trust Deed grants the Stichting Trustees virtually unlimited discretion to manage and invest the trust assets, "irrespective of any law or rule of court limiting or restricting the investment of trust funds." [11] Thus, the government concludes that Messrs. Wasserman and Bludhorn, when acting as Stichting Trus-

tees, will always be free to act in conformance with the interests of MCA and Paramount and in concert with CIC.

The government's control theory disregards the Trustees' duty of loyalty to the Stichting beneficiaries. As fiduciaries, regardless of the breadth of their discretion, the Stichting Trustees have a duty to exercise their powers in good faith and without concern for their own personal interests or for those of third parties. *See* Bogert, Trusts and Trustees § 543 (2nd Ed. 1978). Thus, although the Trust Deed grants the Trustees broad investment discretion, and may effectively preclude judicial review of the Trustees' investment judgments, it does not, and cannot, relieve the Trustees of their fiduciary duty of loyalty to the trust beneficiaries. Under California law,[12] even a grant of absolute discretion "does not authorize a trustee to neglect its trust or abdicate its judgment," *Coberly v. Superior Court*, 231 Cal.App.2d 685, 689, 42 Cal.Rptr. 64, 67 (1965), and the California courts will review a trustee's actions to determine whether they are "unreasonable, arbitrary, capricious or . . . in bad faith." *Lix v. Edwards*, 82 Cal.App.3d 573, 578, 147 Cal. Rptr. 294, 298 (1978). *See* Cal.Civ.Code § 2269(c) (West Supp.1982) ("where a trust

---

**10.** The individual interests of the Stichting beneficiaries could conflict with the corporate interests of CIC both in the short run—e.g., in the need for cash distributions from the distributorships—and in the long run—e.g., in the attractiveness of continued investment in the distributorships.

**11.** The trust instrument provides in pertinent part:

"It shall be the duty of the Board [of Trustees]: to hold, to invest and reinvest the capital in such manner as they in their sole discretion may determine.

"The Board [of Trustees] shall invest and reinvest the capital and have the capital invested, without distinction between principal and income, in such securities and other property, real or personal, of any kind, including bonds, notes, debentures and common and preferred stocks as the Board may deem proper and suitable, irrespective of any law or rule of court limiting or restricting the investment of trust funds. The Board of Trustees may use the capital to purchase insurance policies or annuity contracts issued by an insurance corpora-

tion. The Board of Trustees may reserve from investment and keep unproductive of income, without liability for interest, any portion of the capital in cash or cash balances as they in their complete discretion may from time to time determine." Deed of creation of the foundation called Stichting Cinema International Corporation Employer's Trust Fund, Art. 10(a), 11.

**12.** Because Stichting was created under Netherlands law, the Trustees are presumably subject to the Netherlands law of fiduciaries. Under Fed.R.Civ.P. 44.1, when the parties have given written notice of intent to raise an issue of foreign law, a federal court may take judicial notice of the laws of a foreign country. Because the parties here neither gave such written notice, nor sought in the district court to establish Netherlands law, we are under no obligation to apply Netherlands law; thus, we look to the law of the forum state, California, to determine the nature of the Trustees' fiduciary duty. *See Commercial Insurance Co. of Newark v. Pacific-Peru Construction Corp.*, 558 F.2d 948, 952 (9th Cir. 1977).

instrument confers absolute, sole, or uncontrolled discretion upon a trustee, the trustee shall act in accordance with fiduciary principles and shall not act in bad faith or in disregard of the purposes of the trust.") *See generally* Cal.Civ.Code §§ 2228–2240 (West 1954).

The government's control theory rests on the implicit assumption that, in the event of conflicting interests, the Trustees will act in derogation of their fiduciary duty, choosing the corporate interests of MCA and Paramount over those of the individual executives who are the trust beneficiaries. This court has rejected a similar theory in the area of family partnerships, *see Bateman v. United States*, 490 F.2d 549 (9th Cir. 1973), and we reject the theory in this case.

In *Bateman*, two general partners in a limited partnership transferred partnership interests to themselves as trustees for the benefit of their children. The Commissioner challenged the transaction, arguing that the trusts were not legitimate partners for tax purposes and that, as donors, trustees, remaindermen and general partners, the donor-trustees were the true owners of the trusts. This court acknowledged that the donor-trustees had gone to the "brink of permissible control," 490 F.2d at 553; we emphasized, however, that the trustees were obligated to exercise their broad powers in accordance with fiduciary principles, and ruled that, absent evidence that the trustees had violated their fiduciary duty, the trusts must receive tax recognition. *Id.* *See also Kuney v. United States*, 524 F.2d 795, 796 (9th Cir. 1975) ("[T]he question 'whether [a] trustee [with extraordinarily broad powers] has become the real owner of the partnership interest' ... depend(s) on the manner in which the trustee actually conducts himself in reference to the trust.")

Like the donor-trustees in *Kuney*, MCA and Paramount may have gone to the brink of permissible control over Stichting; but the government offers no evidence that the Messrs. Wasserman and Bludhorn, in their capacities as Stichting Trustees, have gone over the brink. Thus, although we agree with the government that CIC and Stichting are likely, as a practical matter, always to act in concert in their management of the distributorships, we cannot conclude as a matter of law that their interests will never diverge. Nor do we think that the tax consequences of a legitimate business transaction should turn on an unsupported assumption that certain parties to the transaction will act in breach of their fiduciary duties and, indeed, unlawfully. Thus, we conclude that the disputed provisions, which restrict the transferability of distributorship interests and limit the continuity of distributorship life, have legal effect. We hold that under § 301.7701–2 the distributorships must be classified as partnerships for domestic tax purposes.[13]

## IV

The government suggests that even if the distributorships technically satisfy the partnership test of § 301.7701–2, we should construe the regulations broadly to classify the distributorships as corporations, thereby eliminating an abusive form of tax shelter. Brief for the Appellee 17, 21. The government reasons that Congress enacted subpart F to eliminate the tax deferral advantage of doing business through controlled foreign corporations, by taxing currently to United States shareholders all income that is deemed earned by those shareholders. The government asserts that in enacting subpart F Congress was more concerned

---

**13.** Because we hold that CIC and Stichting represent distinct economic interests, we do not reach the question whether, even if we assumed an identity of interests, the provisions of local law would effectively limit the transferability of interests and the continuity of the distributorships' life. *See* Treas.Reg. § 301.-7701–2(b)(2), –2(e)(1); Rev.Rul. 75–19, 1975–1 I.R.B. 382 ("partnership" among four domestic subsidiaries, each wholly owned by the same domestic parent, lacks continuity of life, centralization of management and limited liability, because formed under a statute with protections corresponding to those of the Uniform Partnership Act). *See also Report on Foreign Entity Characterization*, 35 Tax L.Rev. 169, 208 (1980) (suggesting that in Rev.Rul. 75–19 and Rev.Rul. 75–214, *supra*, the IRS applied different tests to domestic and foreign entities).

with the nature of the income than the form of the entity generating the income, and that CIC's distributorship income is precisely the kind that Congress intended to tax currently under I.R.C. § 951(a).

We find this argument unpersuasive. Although we agree that CIC's distributorship income is apparently the kind that Congress intended to tax currently *if* received from a controlled *corporation*, we decline the government's invitation to depart from the plain language of the statute. Congress wrote the statute unambiguously to apply to subpart F income received from controlled "corporations" only. If the omission of income received from controlled partnerships has indeed created an unjustified loophole in the tax laws, the remedy lies in new legislation, not in judicial improvisation. *See United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232, 236, 75 S.Ct. 733, 736, 99 L.Ed. 1024 (1955).

The government's argument that we should read the regulations expansively because they were developed to distinguish domestic, not foreign, entities, is similarly unpersuasive.[14] The government stipulated that for purposes of this litigation the tax character of the distributorships would be determined by the § 301.7701–2 regulations. Those regulations, which were originally designed to limit the availability of corporate tax status,[15] *Kurzner v. United States*, 413 F.2d 97, 105 (5th Cir. 1969), prescribe a mechanical and formalistic test, *see Larson*, 66 T.C. at 172, permitting taxpayers to select a form of business organization with certainty about the attendant tax consequences. If the test has proven unsatisfactory, or if the Commissioner determines that the test should not apply to foreign entities, the Commissioner is free to

promulgate a new regulation that taxpayers can rely on in planning their foreign business ventures. *See Henry C. Beck Builders, Inc.*, 41 T.C. 616, 628–29 (1964); *Report on Foreign Entity Characterization*, 35 Tax L.Rev. 169, 211–12 (1980).

The decision of the district court is REVERSED.

---

14. "The present case is a classic example of how a general test, which has its origin in the domestic situation, if given an excessively restricted reading, may be invoked to protect an abusive form of tax shelter which was the very object of the subpart F legislation." Brief of the Appellee 21.

15. The regulations tend "to be composed of a series of sentences which, though not directly contradictory, are not entirely consistent. This tendency probably resulted in most cases from an effort to resolve most questions *against* the [corporation] classification and to insure that every general partnership subject to the Uniform Partnership Act, and most limited partnerships subject to the Uniform Limited Partnership Act, will not be classified as [corporations], while paying lip service to theoretical considerations." McKee, Nelson & Whitmire, 1 Federal Taxation of Partnerships and Partners ¶ 3.06[2] at 3–42 (1977).