BROWN GROUP, INC. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT *

Docket No. 104–92.      Filed January 25, 1995.

---

*An opinion in this case was filed on Apr. 12, 1994, *Brown Group, Inc. v. Commissioner,* 102 T.C. 616 (1994). That opinion was subsequently withdrawn and reassigned to this Division for reconsideration.

*Harold G. Blatt, Juan D. Keller,* and *Philip B. Wright,* for petitioner.

*James A. Kutten* and *Richard A. Witkowski,* for respondent.

HALPERN, *Judge:* Petitioner is the common parent corporation of an affiliated group of corporations making a consolidated return of income (the affiliated group). Respondent determined a deficiency of $388,992.85 in the income tax liability of the affiliated group for its taxable year ended November 1, 1986.[1]

The only issue in dispute is whether Brown Cayman, Ltd.'s (Brown Cayman's) share of partnership income from Brinco, a Cayman Islands partnership, is subpart F income, includable in the gross income of a member of the affiliated group under section 951(a). We hold that it is.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

A trial was held on March 9, 1993. Petitioner called no witnesses. Respondent called one: Theodore Presti. The parties had stipulated certain facts, however, and the facts stipulated are so found. The stipulation of facts and attached exhibits is incorporated herein by this reference. The following summarizes the facts relied on by us in reaching our decision.

Petitioner Brown Group, Inc. (sometimes Brown Group), is a New York corporation. At the time the petition herein was filed, petitioner's principal place of business was in St. Louis, Missouri. The following diagram facilitates an understanding of the relationships of the parties involved:

---

[1] The parties have stipulated that petitioner's "taxable period" was a 52–53 week year ending on the Saturday nearest to Oct. 31. They have stipulated the same with regard to Brown Group International, Inc., and Brinco, discussed *infra.* They have stipulated that Brown Cayman, Ltd., also discussed *infra,* had a "taxable period" ending Nov. 30.

Throughout 1985 and 1986, Brown Group had divisions that sold footwear at the retail and wholesale levels, manufactured footwear, and imported footwear. Brown Group manufactured footwear in the United States and imported footwear from, among other countries, Brazil.

Brown Group International (International), a Delaware corporation, was incorporated in 1985, as a wholly owned subsidiary of Brown Group. Throughout 1985 and 1986, International was a U.S. shareholder of Brown Cayman within the meaning of section 951(b).

Brown Cayman, a Cayman Islands corporation, was incorporated in 1985. Brown Cayman was a controlled foreign corporation within the meaning of section 957(a) at all times relevant to this case.

T.P. Cayman, Ltd. (T.P. Cayman), a Cayman Islands corporation, was incorporated in March 1985.

Pidge, Inc., is a Missouri corporation; the date of its incorporation is not contained in the record.

Brinco, a partnership within the meaning of section 7701, and the regulations thereunder, was formed in the Cayman Islands in March 1985. The partners of Brinco, and their percentage interests in the net profits and losses of Brinco, were Brown Cayman, 88 percent, T.P. Cayman, 10 percent, and an individual, Delcio Birck (Birck), 2 percent.

Prior to the formation of Brinco, Brown Group utilized independent agents to purchase footwear manufactured in Brazil. At that time, Birck, a Brazilian citizen, and Presti, a U.S. citizen, were employed by a company, Michelle Manard, which purchased footwear manufactured in Brazil on behalf of Brown Group and others. Michelle Manard "officially" charged Brown Group a 7-percent commission, although occasionally that rate was greater. Brinco was formed, among other reasons, to attract Presti and Birck to source Brazilian footwear exclusively for the Brown Group companies and to consolidate Brown Group's Brazilian buying power. Brinco was structured as a partnership, among other reasons, because: (1) Presti's salary requirements could not be satisfied within Brown Group's existing payroll structure, (2) it allowed Presti and Birck to have some entrepreneurial interest in Brinco's operations, and (3) it permitted the partners to avoid Brazilian currency controls and currency fluctuations.

During 1985 and 1986, Brinco acted as purchasing agent for International with respect to footwear manufactured in Brazil. The footwear so imported was sold primarily in the United States. Presti was the managing partner of Brinco. As such, he was responsible for the design, manufacture, and quality control of the footwear. He also supervised Brinco's operations within Brazil.

The Brown Group companies paid Brinco a 10-percent commission for acting as their purchasing agent for footwear manufactured in Brazil. The commission was based on the purchase price of the footwear. Brinco's 1985 commission income for acting as purchasing agent for the Brown Group companies was $1,119,970. The Brown Group companies included the commissions paid to Brinco in their costs of goods sold.

Pursuant to negotiations among the Brinco partners, because of the uncertainty of first-year profits, for the 7-month period ending November 2, 1985, T.P. Cayman

received guaranteed payments totaling $151,662 ($21,666 a month for 7 months), instead of its share of partnership profits called for in the Brinco partnership agreement. After making guaranteed payments to T.P. Cayman, Brinco's partnership net earnings for 1985 totaled $917,465, which were distributed as follows:

| | | |
|---|---|---|
| Brown Cayman | 98% | $897,281 |
| Birck | 2% | 20,184 |

In 1986, T.P. Cayman received its share of partnership profits as called for in the Brinco partnership agreement (and no guaranteed payments).

Brinco was dissolved on October 31, 1987. At that time, Presti became executive vice president of International, and Birck, as an independent agent, continued to source footwear for the Brown Group companies on a commission basis.

Respondent determined that Brown Cayman's distributive share of Brinco's earnings is foreign base company sales income, includable as subpart F income in the gross income of International.

OPINION

I. *Introduction*

For all relevant periods, the parties have stipulated that (1) Brown Cayman was a "controlled foreign corporation" (CFC) within the meaning of section 957(a) and (2) International was a "United States shareholder" of Brown Cayman within the meaning of section 951(b). Accordingly, International must include in its gross income its pro rata share (100 percent) of any "subpart F income" of Brown Cayman. See sec. 951(a). Subpart F income is defined in section 952 to include an item called "foreign base company income". Sec. 951(a)(2). Foreign base company income, in turn, is defined in section 954(a) to include "foreign base company sales income". Sec. 954(a)(2). Foreign base company sales income includes, among other things: "income (whether in the form of profits, commissions, fees, or otherwise) derived in connection with * * * the purchase of personal property from any person on behalf of a related person" where the goods are both produced and sold for use outside the country in which the CFC is incorporated. Sec. 954(d)(1). The term "related per-

son" is defined in section 954(d)(3). It is clear that International was a related person with regard to Brown Cayman. See sec. 954(d)(3) ("such person is a corporation which controls * * * the controlled foreign corporation"). It also is clear that Brinco earned commission income by arranging for the purchase of footwear by International.[2] Brinco was a partnership of which Brown Cayman was a partner. Brown Cayman was entitled to share in the income of Brinco. Pursuant to section 702, Brown Cayman was required to take into account its distributive share of that income.[3] The narrow question we must answer is whether Brown Cayman had income "(whether in the form of profits, commissions, fees, or otherwise) derived in connection with * * * the purchase of personal property from any person on behalf of a related person". See sec. 954(d)(1). We believe that it did.

## II. *Arguments of the Parties*

### A. *Petitioner's Argument*

Petitioner argues as follows: under section 954(d)(3), as in effect for the year in issue, Brinco was not a related person with regard to Brown Cayman or International. Absent such a relationship, Brown Cayman's distributive share of Brinco's income cannot be subpart F income with respect to Brown Cayman or International. Alternatively, the character of the income in question is determined at the partnership (Brinco) level, by treating Brinco as a separate entity. Consequently, the income in question is that of Brinco, not Brown Cayman. Thus, the income cannot be foreign base company sales income of Brown Cayman.

---

[2] On brief, petitioner states: "The Brinco partnership earned commission income by arranging for the purchase of footwear by * * * Brown Group International, Inc., from third parties for consumption primarily within the United States. The property was manufactured, and sold for use or consumption, outside the Cayman Islands, which was Brinco's and * * * Brown Cayman, Ltd's, country of incorporation. [sic]."

[3] For purposes of applying the rules of subpt. F, Brown Cayman is, with some modification, treated as if it were a domestic corporation taxable under sec. 11 and by applying the principles of sec. 61 and the regulations thereunder. See sec. 1.952–2(a)(1), Income Tax Regs. Subch. K of the Code (containing provisions dealing with the taxation of partners and partnerships) is applicable. See par. (c)(1) of sec. 1.952–2, Income Tax Regs. Consider also the additional discussion at sec. III. B., *infra.*

B. *Respondent's Argument*

Respondent agrees that, under section 954(d)(3), as in effect for the year in issue, Brinco was not a related person with regard to Brown Cayman or International. Respondent's argument is as follows: The aggregate theory of partnerships should apply in this case because that theory furthers the purposes of subpart F. Under the aggregate theory, Brown Cayman's distributive share of Brinco's income must be treated as foreign base company sales income and, consequently, subpart F income. International, the U.S. shareholder of Brown Cayman, must include its pro rata share (100 percent) of Brown Cayman's subpart F income in its gross income under section 951(a). Respondent has not argued that Brinco is a sham.

III. *Analysis*

A. *Introduction*

Substantially, we agree with respondent. We believe that a close reading of the regulations under subpart F, a consideration of the structure and language of subchapter K (the partnership provisions), Congress' purpose in enacting subpart F, and certain language of section 954(d)(1) compel the result that respondent advocates.

B. *Subpart F Regulations*

Section 954 deals with the computation of foreign base company income, of which foreign base company sales income is a component. Sec. 954(a)(2). Section 1.954A–1, Income Tax Regs., deals with the computation of foreign base company income for taxable years of a CFC beginning after 1975 and before 1987. See sec. 1.954A–1(a), Income Tax Regs.; sec. 1.954–0T(a)(2), Temporary Income Tax Regs. Section 1.954A–1(c), Income Tax Regs., states in pertinent part:

For purposes of section 954 and this section, * * * foreign base company sales income as defined in § 1.954–3 * * * shall be taken into account in determining foreign base company income after allowance for deductions properly allocable to such [category] of income. For determination of gross income and deductions for purposes of section 954, see section 952 and the regulations thereunder. * * *

Section 1.952–2(a)(1), Income Tax Regs., states in pertinent part:

the gross income of a foreign corporation for any taxable year shall, subject to the special rules of paragraph (c) of this section, be determined by treating such foreign corporation as a domestic corporation taxable under section 11 and by applying the principles of section 61 and the regulations thereunder.

Paragraph (c)(1) of section 1.952–2, Income Tax Regs., states that, as a general rule, certain subchapters of chapter 1 of the Code shall not apply. Subchapter K, chapter 1, subtitle A of the Code, sections 701 through 761 (subchapter K), is *not* among the excluded subchapters. Thus, by implication, subchapter K *is* applicable.

Section 1.952–3(a), Income Tax Regs., describes the computations that a U.S. shareholder of a CFC must make in connection with the application of section 954 and the subsequent application of section 952. Paragraph (b) of section 1.952–3, Income Tax Regs., states the general rule. That rule is that the U.S. shareholder must determine the subpart F income of the CFC by, among other things, determining the foreign base company sales income of the CFC.

Section 1.954–3(a)(1)(i), Income Tax Regs., mirroring the statute, states that foreign base company sales income of a CFC includes, among other things, commission income derived in connection with the purchase of personal property from any person on behalf of a related person.

In summary, the cited provisions of the regulations lay out a scheme under which the U.S. shareholder of a CFC must determine the foreign base company sales income of the CFC (including the described commission income) under most of the rules applicable to a domestic corporation determining its tax liability under section 11, including the rules of subchapter K.

C. *Subchapter K*

Subchapter K deals with the taxation of partners and partnerships.

Section 701 provides that a partnership as such shall not be subject to the income tax. Persons carrying on business as partners are liable for income tax only in their separate or individual capacities.

Section 702(a) provides that, in determining a partner's income tax, each partner must take into account separately the partner's distributive share of items enumerated in section 702(a)(1) through (8). Under section 702(a)(7), a partner must take into account separately those items of income, gain, loss, deduction, or credit prescribed by regulations.

Section 1.702–1(a)(8)(ii), Income Tax Regs., provides that each partner must take into account separately the partner's distributive share of any partnership item that, if separately taken into account by any partner, would result in an income tax liability for that partner different from that which would result if that partner did not take the item into account separately.

Section 702(b) provides that the character of any item included in a partner's distributive share under paragraphs (1) through (7) of section 702(a) is determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership. Section 1.702–1(b), Income Tax Regs., provides, in pertinent part:

The character in the hands of a partner of any item of income, gain, loss, deduction, or credit described in section 702(a)(1) through * * * [7] shall be determined as if such item were realized directly from the source from which realized by the partnership or incurred in the same manner incurred by the partnership. * * *

Section 703(a)(1) provides that a partnership shall separately state the items described in section 702(a) in computing its taxable income.

Brown Cayman, a partner of Brinco, is a foreign corporation and, apparently, has no Federal income tax liability. Nevertheless, International, a U.S. shareholder with respect to Brown Cayman, must take into account its pro rata share of Brown Cayman's subpart F income. See sec. 951(a). Applying Federal income tax principles, International must compute those items of Brown Cayman's income that constitute subpart F income. See sec. 1.952–2(a), Income Tax Regs. Unless items that constitute, for instance, foreign base company sales income are separately stated, International will be unable to make that computation. Since, under section 951(a), International is taxed directly on its pro rata share of Brown Cayman's subpart F income, we must look to

International's tax liability to determine whether Brinco must separately state items, such as commission income, that could constitute foreign base company sales income. To give effect to section 702(a)(7) and section 1.702–1(a)(8)(ii), Income Tax Regs., and to avoid frustrating the purpose of Congress in enacting subpart F, Brinco must separately state its commission income.

D. *Subpart F*

1. *Purpose*

Subpart F contradicts the general rule that the shareholders of a corporation defer paying a tax on the income earned by the corporation until such income is distributed to them, usually in the form of a dividend. Subpart F was designed to remove the tax deferral benefits of certain offshore operations that Congress considered to be "tax haven" devices; i.e., foreign operations that were artificially structured to take advantage of a low (or zero) rate of foreign tax. S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 784. (S. Rept. 1881 accompanied H.R. 10650, which became the Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, which added subpart F.)

2. *Conduit Approach*

It is important to keep in mind the method that Congress chose to meet its objectives: subpart F imposes a conduit scheme with regard to subpart F income. Subpart F income is taxed currently to U.S. shareholders notwithstanding that no distribution of such income is made. See sec. 951. The parallel with subchapter K is obvious. Congress chose to minimize (perhaps even eliminate) the entity character of the CFC in order to tax U.S. shareholders as if they had earned directly the subpart F income earned by the CFC. It would be ironic, indeed, if one could defeat the clearly expressed intent of Congress to tax the income from the activities involved here by engaging in those activities though a form of doing business that not only is taxed on a conduit basis but whose non-tax-law character often resembles an aggregate of per-

sons doing business together (as mutual agents) rather than an entity.[4]

### 3. *Facts at Hand*

The facts of this case show that the formation of Brinco did not significantly change the way Brown Group (through International) imported shoes manufactured in Brazil. Presti and Birck still continued to do the actual commission agent work. They did it, however, as partners (directly or indirectly) in Brinco. Under the prior arrangement, Brown Group had paid a 7-percent commission to Michelle Manard, Presti and Birck's employer. Ostensibly, Brown Group raised its commission rate to 10 percent. However, as the owner, indirectly, of Brown Cayman, a partner in Brinco, Brown Group, was entitled to receive back the bulk of that 10 percent and, apparently, realized a net savings. Had Brown Cayman hired Presti and Birck as employees, or otherwise engaged them as agents, and collected directly from Brown Group or International a commission agent's fee, it would be clear that at least the net amount retained by Brown Cayman would be foreign base company sales income.

The law of partnerships in the Cayman Islands is derived from the law of partnerships in England. See Davies, The Legal System of the Cayman Islands 89, 188–194 (1989). Compare Partnership Law, 1983 (Cayman Islands) with Partnership Act, 1890, 53 & 54 Vic., c. 39 (Eng.). English law lends itself to the view that Brown Cayman, as a partner of Brinco, acting on its own behalf, and through its partners (its agents), did function as a commission agent.[5] The facts seem

---

[4] See *infra* note 6.

[5] As in the United States, partnerships under English law sometimes are best understood in terms of an entity model and sometimes in terms of an aggregate model. Rather than using the terms "entity" and "aggregate", however, English partnerships are viewed either in a commercial notion or a legal notion. The commercial notion, in which the partnership is seen as an entity, stems from the business efficiencies that can be achieved if a firm is viewed as separate from those persons who make up the firm. Lindley & Banks on Partnership 26 (16th ed. 1990). Under the legal notion of partnership, the "firm is not generally recognized as distinct from the partners composing it." *Id.* at 27. When addressing the nature of the relationship between or among partners, English law appears to tend towards the aggregate model. For example:

Every member of an ordinary partnership is at one and the same time both a principal and an agent. As a principal, he is bound by what he does himself and by what his co-partners do on behalf of the firm, provided what they do falls within the limits of their authority; as an agent, he binds them by what he does for the firm, provided he keeps within the limits of his authority. [*Id.*]

ripe for the application of subpart F. A contrary result would lead to just the type of siphoning of profits that Congress was concerned with when it subjected foreign base company sales income to the conduit treatment of subpart F. But cf. *MCA Inc. v. United States,* 685 F.2d 1099, 1104–1105 (9th Cir. 1982) (remedy for loophole in subpart F "lies in new legislation, not judicial improvisation").

### E. *Aggregate Versus Entity*

#### 1. *Introduction*

To effectuate the purpose of Congress in enacting subpart F, we will require Brinco to state separately its commission income under section 703. What we are doing might be characterized as emphasizing the "aggregate" or "conduit" nature of Brinco, a partnership, over its "entity" nature. We have pursued a technical road in our analysis, and have avoided framing the issue in terms of aggregate versus entity. Nevertheless, and particularly in light of petitioner's argument that Brinco should be treated as a separate entity, we will address the aggregate versus entity question briefly.

#### 2. *Dual Nature*

Authorities on partnership taxation have stated that subchapter K does not espouse either the aggregate or the entity theory of partnerships, but rather blends the two theories. 1 McKee Nelson & Whitmire, Federal Taxation of Partnerships and Partners (hereafter McKee et al.), par. 1.02 (2d ed. 1990). We agree. Compare sec. 751 with sec. 741. Moreover, for purposes of interpreting provisions of the Code not contained in subchapter K, a partnership also may be treated either as an aggregate of its partners or as an entity distinct from its partners. Compare *Casel v. Commissioner,* 79 T.C. 424, 433–434 (1982) (aggregate approach of regulations under section 267 appropriate) with *Madison Gas & Elec. Co. v. Commissioner,* 72 T.C. 521, 564 (1979), affd. 633 F.2d 512 (7th Cir. 1980) (business of partnership, a business separate

---

Despite, perhaps, a greater emphasis on the aggregate view (relative to the United States, particularly under the Revised Uniform Partnership Act), English courts will employ either view depending upon the circumstances of a particular case. Lindley & Banks on Partnership 26. There seems little doubt that English partnership law would be susceptible to the conclusion that Brown Cayman, as a partner of Brinco, acting on its own behalf, and through its partners (its agents), functioned as a commission agent.

from the business of the partners). The treatment of partnerships in each context must be determined on the basis of the characterization most appropriate for the situation. See H. Conf. Rept. 2543, 83d Cong., 2d Sess. (1954), 1954 U.S.C.C.A.N. 5280. H. Rept. 2543 accompanied H.R. 8300, 83d Cong., 2d Sess., which became the Internal Revenue Code of 1954.

### 3. *Appropriate Emphasis*

For the reasons set forth above in our discussion of subpart F, we believe that, to accomplish the purposes of Congress in enacting subpart F, the aggregate nature of Brinco as a partnership must be emphasized. We are not here dealing with the computation of Brinco's income but with the consequence to Brinco's partners stemming from their rights under the partnership agreement to share in that income. The relationship between the entity approach to the computation of partnership income found in sections 703 and 706 and the aggregate approach applied to the taxation of that income found in sections 701, 702, and 704 has been described by the Supreme Court as follows:

For * * * [the purpose of calculating partnership income], the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners. Once its income is ascertained and reported, its existence may be disregarded since each partner must pay a tax on a portion of the total income as if the partnership were merely an agent or conduit through which the income passed. [*United States v. Basye,* 410 U.S. 441, 448 (1973); fn. ref. omitted.]

McKee et al. have characterized the Supreme Court's analysis as follows:

This analysis of the statute embodies a very clear and sharply defined separation between (1) the treatment of a partnership as a separate entity for purposes of determining its income, and (2) the taxation of partnership income, as so determined, to the partners under the conduit approach. * * * [1 McKee et al., *supra* par. 9.01[2], at 9–6.]

### 4. *Application of Entity-Aggregate Distinction in Practice*

Indeed, an examination of cases requiring an entity (partnership) level determination of income shows that, once such determination is made, the partnership is ignored and the individual partners take account of such income as if they

had earned it directly. E.g., *Pleasant Summit Land Corp. v. Commissioner,* 863 F.2d 263, 272 (3d Cir. 1988), affg. in part and revg. in part T.C. Memo. 1987–469 ("After the partnership's income and deductions are calculated and reported, it is a conduit through which income and deductions are distributed to individual partners."); *Davis v. Commissioner,* 74 T.C. 881, 905–906 (1980), affd. 746 F.2d 357 (6th Cir. 1984) (capital gains determined at partnership level retain that characterization at partner level).

Notwithstanding such shift in emphasis from an entity view at the partnership level to an aggregate view at the partner level, any characterization of the partnership's activity with regard to an item generally persists. For instance, in *Goodwin v. Commissioner,* 75 T.C. 424 (1980), affd. without published opinion, 691 F.2d 490 (3d Cir. 1982), the taxpayer argued that we should inquire as to trade or business activity at his, the partner's, level to characterize certain deductions taken by the partnership. We declined, requiring him to treat his distributive share of the expenses as a nondeductible startup cost associated with the formation of a new (partnership) business. We held: "in the context of section 162, the character of the deductions, i.e., whether they were incurred in the course of a trade or business, must be resolved at the partnership level." *Id.* at 437.

Pertinent to the question at hand, we, and other courts, have attributed to a partner the activities and even the property of a partnership to determine whether, by virtue of such activity or property, the partner had a particular status important for determining some aspect of the partner's Federal income tax status. In *Unger v. Commissioner,* 936 F.2d 1316 (D.C. Cir. 1991), affg. T.C. Memo. 1990–15, the question was whether a Canadian resident, a limited partner in a Massachusetts partnership, was taxable on his distributive share of a certain capital gain realized by the partnership. The question turned on whether the partner maintained a "permanent establishment" within the United States. For purposes of the case, the term "permanent establishment" meant an office or other fixed place of business. The court held that, since the partnership maintained a permanent office in Boston, the taxpayer had a permanent establishment in the United States by virtue of his interest in the partnership offices. *Id.* at 1320; *Donroy, Ltd. v. United*

*States,* 301 F.2d 200 (9th Cir. 1962) (similar, but with emphasis on the agency nature of the general partner's relationship to a limited partner); *Johnston v. Commissioner,* 24 T.C. 920, 923 (1955) (permanent place of business in the United States by virtue of partnership interest); *Cantrell & Cochrane, Ltd. v. Commissioner,* 19 B.T.A. 16, 24 (1930) (whether U.K. corporation, a member of a "syndicate" with an office and a place of business in the United States, and engaging in a trade or business in the United States, either itself engaged in a trade or business in the United States or had any office or place of business therein: "In the eye of the law at least it was present here as a party to the conduct of the business of the 'syndicate' through which it established a place of business within the United States for doing a part of its business."). The situation here is analogous. Brown Cayman should be put into the shoes of Brinco for determining whether Brown Cayman was earning commission income on sales by third parties to International.

### F. "[I]n connection with"

Our analysis has relied heavily on the provisions of subchapter K. Indeed, that is the path that the parties have taken, and it is supported by the weight of commentary that the issue has generated.[6] Before addressing one final argument of petitioner, we wish to point out that certain words of section 954(d)(1), as recently interpreted by this Court, lend support to our analysis. As stated earlier, the term "foreign base company sales income" is defined in section 954(d)(1). In pertinent part (with emphasis added), the definition includes:

income (whether in the form of profits, commissions, fees, or otherwise) derived in connection with * * * the purchase of personal property from any person on behalf of a related person * * * [Emphasis added.]

Recently, we had the opportunity to construe the phrase "in connection with" as used in section 162(k)(1). *Fort Howard Corp. v Commissioner,* 103 T.C. 345, 351 (1994). In *Fort*

---

[6] Davis & Lainoff, "U.S. Taxation of Foreign Joint Ventures", 46 Tax Law Rev. 165, 273–274 (1991) (emphasizing the aggregate nature of the partnership rather than relying strictly on sec. 702); Fox & Daubi, "Rev. Rul. 89–72: Foreign Base Company Sales Income Earned by Partnerships", 18 Tax Mgmt. Intl. J. 297 (July 14, 1989) (determination of character at partnership level); Shakow, "How Now *Brown* K?", 63 Tax Notes 1761 (1994); cf. 1 McKee et al., Federal Taxation of Partnerships and Partners, supp. par. 9.01[3][b], at 59–22 (2d ed. 1990).

*Howard Corp.,* we observed that words in a revenue act should be interpreted in their ordinary, everyday sense. *Id.* at 351. We stated that the phrase "in connection with" had been, and should be, interpreted broadly. *Id.* at 352.[7] We said that the phrase means "associated with, or related". *Id.* We consulted a dictionary, and said: "Events or elements are 'connected' when they are 'logically related' to each other." *Id.* (quoting Webster's Third New World Dictionary (1986)). That relationship exists here. Brown Cayman was a CFC. Its distributive share of partnership profits was, by design and reality, connected to and dependent on purchases made on behalf of a party related to Brown Cayman.

### G. *Brinco as a Related Person*

Finally, we wish to dispose of one argument made by petitioner: viz, that, for the year in question, Brinco was not a related person with regard to Brown Cayman or International. That is true; nonetheless, it is irrelevant. Nothing here turns on whether Brinco is a related person with regard to either Brown Cayman or International. We are dealing here with that part of the definition of foreign base company sales income that involves "the purchase of personal property from any person on behalf of a related person". Sec. 954(d)(1). The inquiry is whether Brown Cayman, through Brinco, purchased footwear on behalf of International. International is the related person, and there is no argument about that. The only possible entity here that can be a controlled foreign corporation is Brown Cayman. As stated, nothing turns on whether Brinco is a related person.

It is true that the definition of related person in section 954(d)(3) was amended in 1986 to include partnerships controlled by or controlling a CFC within the definition of related persons with regard to such CFC. Tax Reform Act of 1986, Pub. L. 99–514, sec. 1221(e)(1), 100 Stat. 2085, 2553–2554. Nevertheless, the relevant definition of what constitutes foreign base company sales income ("income * * * derived in connection with * * * the purchase of personal property from any person *on behalf of* a related person") was not amended.

---

[7] But cf. our decision in *Huntsman v. Commissioner,* 91 T.C. 917, 919–920, (1988) ("in light of legislative history of section 461(g), a limited reading of the term 'in connection with the purchase or improvement' is appropriate here"), revd. 905 F.2d 1182 (11th Cir. 1990).

Sec. 954(d)(1) (emphasis added). Nothing here was purchased on behalf of Brinco; indeed, Brinco did the purchasing on behalf of International.

## IV. *Conclusion*

For the reasons stated, we find that Brown Cayman had commission income derived in connection with the purchase of personal property from any person on behalf of International. We hold that such income is foreign base company sales income under section 954(d)(1) and that International must include in its gross income subpart F income as determined by respondent.

*Decision will be entered for respondent.*

Reviewed by the Court.

HAMBLEN, PARKER, COHEN, SWIFT, PARR, and BEGHE, *JJ.*, agree with this majority opinion.

WELLS, *J.*, did not participate in the consideration of this opinion.

---

RUWE, *J.*, concurring: I agree with the majority's conclusion that Brown Cayman's distributive share of Brinco's partnership income is subpart F income. However, I believe that there are technical problems with the majority's reliance on subchapter K and the related aggregate versus entity analysis. These problems can be avoided by simply applying the literal terms of section 954. I will first address the problems and then the solution.

## *The Problems*

### 1. *Section 702*

Section 702 provides that each partner must account separately for certain specifically enumerated types of partnership income, losses, and deductions that are described in section 702(a)(1) through (7). If a partnership item is not described in section 702(a)(1) through (7), section 702(a)(8) provides that a partner is to account for his distributive share as "taxable income or loss" from the partnership

"exclusive of items requiring separate computation under other paragraphs of this subsection." Sec. 702(a)(8).

Section 702(b) provides that the character of any item of income that is included in a partner's distributive share under section 702(a)(1) through (7) "shall be determined as if such item were realized directly from the source from which realized by the partnership". Section 702(b)'s character pass-through requirement does not apply to the items covered by section 702(a)(8). The majority uses section 702(b) to characterize Brown Cayman's distributive share of income from Brinco as commissions earned on the purchase of footwear. To do this, Brinco's commission income must be an item described in section 702(a)(1) through (7). Paragraphs (1) through (6) are clearly inapplicable. The majority focuses on paragraph (7) to impute the character of Brinco's commission income to Brown Cayman. Paragraph (7) provides that a partner must separately account for "other items of income * * * to the extent provided by regulations".

The regulation upon which the majority relies is section 1.702–1(a)(8)(ii), Income Tax Regs. Section 1.702–1(a)(8)(ii), Income Tax Regs., provides that "Each *partner* must take into account separately his distributive share of any partnership item which if separately taken into account by any *partner* would result in an income tax liability for *that partner* different from that which would result if *that partner* did not take the item into account separately." (Emphasis added.)

In order for section 1.702–1(a)(8)(ii), Income Tax Regs., to apply, the tax liability of the "partner" must be affected by whether the partnership item is separately taken into account. The problem with applying this regulation to the facts in the instant case is that Brown Cayman is the partner in question, but it has no tax liability. Even if we treat Brown Cayman as if it were a domestic corporation liable for U.S. tax, its tax liability is in no way affected by separately accounting for and characterizing the partnership income attributable to Brinco's commissions. Brown Cayman's hypothetical tax liability would still be based on the income it derived from its distributive share of partnership income. Sec. 61(a)(13). That distributive share of partnership income would include partnership income attributable to Brinco's purchase of footwear. However, the separate characterization of Brown Cayman's income from Brinco as commission

income would have no affect on Brown Cayman's actual or hypothetical tax liability.[1] It follows that section 1.702–1(a)(8)(ii), Income Tax Regs., does not apply, and therefore the result the majority arrives at is not supported by its technical analysis.[2]

## 2. Aggregate vs. Entity

While there may be areas in the law of partnership taxation where the aggregate versus entity issue still exists, I do not believe there is any remaining issue with respect to the type of specific partnership income items that must be characterized by individual partners as if they had realized the income directly from the source from which realized by the partnership. Congress has specifically provided statutory rules in section 702(a)(1) through (8) and subsection (b) that answer this question.[3] In section 702(a)(7), Congress also gave the Department of the Treasury broad regulatory authority to specify additional partnership items that must be separately accounted for and characterized at the partner level. As previously explained, nothing in these partnership provisions requires that the character of the commission income that Brinco earned by purchasing footwear on behalf of Brown Group be separately stated and characterized at the partner level as if it had been "realized directly from the source from which realized by the partnership". Sec. 702(b).

---

[1] The majority implicitly seems to recognize this problem. Their apparent solution is to conclude that "we must look to International's tax liability to determine whether Brinco must separately state items, such as commission income, that could constitute foreign base company sales income." (Majority op. pp. 113–114.) But International was not a "partner"; rather it was a shareholder. No authority is cited for the proposition that sec. 1.702–1(a)(8)(ii), Income Tax Regs., requires that we look beyond the real or hypothetical tax liability of a partner to the tax liability of an entity that is merely a shareholder of the corporate partner. Indeed, to do so is contrary to sec. 1.702–1(a)(8)(ii), Income Tax Regs., which requires the separate statement of a partnership item only when the *partner's* tax liability would be affected by having the *partner* account for the item separately. International is not a partner, and thus its tax liability is not relevant under the plain language of sec. 1.702–1(a)(8)(ii), Income Tax Regs.

[2] The fact that we are dealing with a situation that Congress may have intended to tax under subpt. F is not a justification for disregarding the plain language of the partnership provisions. In a case bearing a striking factual similarity to the instant case, the Government attempted to recharacterize foreign partnerships as corporations so that they would be "related persons" for purposes of subpt. F. This would have caused the income of a controlled foreign corporation to be subpt. F income. See *MCA Inc. v. United States,* 685 F.2d 1099 (9th Cir. 1982). The Court of Appeals for the Ninth Circuit rejected the Government's argument. In *MCA Inc.,* the Government apparently eschewed any reliance on the arguments it is making in the instant case.

[3] As the majority correctly notes, for purposes of subpt. F, the income of a controlled foreign corporation is to be computed as if it were a domestic corporation. A domestic corporation holding an interest in a partnership would have to compute its income from a partnership in accordance with subch. K, which includes sec. 702.

Brown Cayman's distributive share of partnership income falls under section 702(a)(8), and the separate character of the items making up such income does not pass through to the partners under section 702(b).

*The Solution*

### 1. *Section 954(d)*

Brown Group International (a U.S. corporation whose stock is wholly owned by Brown Group), Brown Cayman (a Cayman Islands corporation whose stock is wholly owned by Brown Group International), and Brinco (a Cayman Islands partnership in which Brown Cayman held an 88-percent interest) were formed in 1985 to facilitate the purchase of Brazilian footwear on behalf of Brown Group. Brinco earned commission income by acting as purchasing agent for Brown Group International.

The issue is whether Brown Cayman's distributive share of Brinco's income is "subpart F income". This question can be answered by determining whether Brown Cayman's distributive share of partnership income from Brinco is foreign base company sales income within the meaning of section 954(d)(1).[4]

Section 954(d)(1) provides:

SEC. 954(d). FOREIGN BASE COMPANY SALES INCOME.—

(1) IN GENERAL.—For purposes of subsection (a)(2), the term "foreign base company sales income" means *income* (whether in the form of profits, commissions, fees, *or otherwise) derived in connection with* * * * the purchase of personal property from any person on behalf of a related person where—

(A) the property which is purchased * * * is manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized, and

(B) * * * in the case of property purchased on behalf of a related person, is purchased for use, consumption, or disposition outside such foreign country.

[Emphasis added.]

---

[4] Subpt. F income is a statutory term applicable only to income of a controlled foreign corporation. Sec. 952. Foreign base company sales income, as defined in sec. 954(d)(1), is includable in subpt. F income. Secs. 952(a), 954(a)(2). A controlled foreign corporation is not subject to U.S. tax on its subpt. F income. Rather, the controlled foreign corporation's subpt. F income is includable in the taxable income of the shareholder(s) of the controlled foreign corporation. Sec. 951.

There is no question that Brown Cayman is a controlled foreign corporation or that Brown Group International is a related person within the meaning of section 954(d). There is also no question that the footwear was "manufactured" or "produced" in Brazil, which is "outside the country under the laws of which the controlled foreign corporation is created or organized" (Cayman Islands). Sec. 954(d)(1)(A). Finally, there is no question that the footwear was "purchased for use, consumption, or disposition outside such foreign country." Sec. 954(d)(1)(B). Thus, our only task is to determine whether Brown Cayman's distributive share of Brinco's profits is income of Brown Cayman (the controlled foreign corporation) that was "derived in connection with * * * the purchase of personal property * * * on behalf of a related person" within the meaning of section 954(d)(1).

Brown Cayman's distributive share of Brinco's profits is clearly within the broad term "income (whether in the form of profits, commissions, fees, or otherwise)". Sec. 954(d)(1). Brown Cayman "derived" this income *from*" Brinco as part of Brown Cayman's distributive share of Brinco's profits. Under section 61(a), gross income means all income "from whatever source *derived,* including (but not limited to) the following items: * * * (13) Distributive share of partnership gross income." (Emphasis added.)

The only remaining question is whether Brown Cayman's income from Brinco was "derived *in connection with* * * * the purchase of personal property * * * on behalf of a related person" within the meaning of section 954(d)(1). Brown Group International, Brown Cayman, and Brinco were organized and operated to purchase footwear for Brown Group. This was done by having Brinco act as the purchasing agent for Brown Group International. The purchase of footwear from Brazilian sources (i.e., "from any person") was accomplished by Brinco acting as an agent on behalf of Brown Group International ("a related person"; i.e., related to Brown Cayman). Brinco's purchasing activity as an agent for Brown Group International was the reason why commissions were generated. Those commissions, in turn, produced partnership profits and resulted in Brown Cayman's distributive share of those profits. Brown Cayman's distributive share of profits from Brinco was thus "derived *in connection with* * * * the purchase of personal property * * * on behalf

of a related person." Having met the literal provisions of section 954(d)(1), it becomes unnecessary to attribute the commission-earning activities directly to Brown Cayman through the application of section 702 or the aggregate approach.

## 2. *Interpretation of "in connection with"*

The foregoing analysis relies on a broad reading of the term "in connection with". This phrase has previously been given a broad interpretation. *Snow v. Commissioner,* 416 U.S. 500, 502–503 (1974); *Huntsman v. Commissioner,* 905 F.2d 1182, 1184 (8th Cir. 1990); *Fort Howard Corp. v. Commissioner,* 103 T.C. 345, 351–352 (1994). In *Fort Howard Corp.,* we said that "in connection with" "means associated with, or related" and that "Events or elements are 'connected' when they are 'logically related'" to each other. *Id.* at 351–352.[5] That relationship exists here. Brown Cayman's distributive share of partnership profits was, by design and in reality, associated with, logically related to, and dependent upon commissions paid to Brinco for acting as a purchasing agent on behalf of a party related to Brown Cayman.

Congress intentionally used the phrase "in connection with" in lieu of more narrow terms such as "from" or "for",[6] and a broad interpretation of the phrase is consistent with the legislative objective of subpart F. Subpart F was "designed to end tax deferral on 'tax haven' operations by U.S. controlled corporations." S. Rept. 87–1881 (1962), 1962–3 C.B. 707, 785. Brown Cayman was a U.S. controlled cor-

---

[5] At issue in *Fort Howard Corp. v. Commissioner,* 103 T.C. 345 (1994), was whether the taxpayer could take deductions for the costs of obtaining financing necessary to carry out a plan to redeem its own stock. Prior to the enactment of sec. 162(k), such financing costs could be amortized and deducted over the life of the loan. Sec. 162(k) generally provides that "no deduction otherwise allowable shall be allowed * * * for any amount paid or incurred by a corporation *in connection with* the redemption of its stock." (Emphasis added.)

In *Fort Howard Corp.,* we held that the financing costs were connected and related to the redemption and a necessary step in the taxpayer's redemption plan. As such, we found that they came within the broad language of sec. 162(k) that disallowed deductions "incurred in connection with" the redemption.

[6] For example, sec. 61 provides that gross income means "income *from* whatever source derived, including":

"Compensation *for* services";

"Gross income derived *from* business;"

"Gains derived *from* dealings in property;"

"Income *from* life insurance and endowment contracts;" and

"Income *from* discharge of indebtedness".

(Emphasis added.)

poration. Its operations consisted of being a partner in Brinco. Had Brown Cayman itself acted as purchasing agent and earned commissions as purchasing agent for Brown Group International, it would be clear that the commissions would be subpart F income. If we were to accept petitioner's position, Brown Group could circumvent subpart F and successfully defer a significant amount of U.S. tax simply by establishing· and interposing a partnership (Brinco), whose profits would be distributable to Brown Cayman.

During 1985, Brown Group paid commissions to Brinco of $1,119,970. These commissions were added to Brown Group's cost of goods sold. Brinco distributed $897,281 during 1985 to Brown Cayman, its 88-percent partner. As a result, Brown Group reduced its gross profit for U.S. tax purposes by $1,119,970, while at the same time recouping $897,281 of that amount through its controlled foreign corporation without being subject to U.S. tax on the $897,281. Surely, Congress intended subpart F and the broad language of section 954(d)(1) to apply to this type of situation when it defined foreign base company sales income to include income "derived *in connection with* * * * the purchase of personal property * * * on behalf of a related person".

---

BEGHE, *J.,* concurring: Having joined the majority opinion, I write separately in an effort to provide some additional support.

I don't disassociate myself from the majority's expansive interpretation and application of section 702 and the regulation thereunder. The rationale of Rev. Rul. 86–138, 1986–2 C.B. 84 (although revenue rulings are not binding on this Court, see, e.g., *Stark v. Commissioner,* 86 T.C. 243, 250–251 (1986)), properly can be extended to support the majority's conclusion that sections 702(a) and 703(a) should be interpreted to prevent the interposition of an entity that has no U.S. income tax liability from disrupting the conduit regimes of subpart F and subchapter K.

However, if a literalistic interpretative approach to section 702(a) and section 1.702–1(a)(8)(ii), Income Tax Regs., were to be applied in this case (as the other concurrences and the dissent would do), the operative facts would be outside sec-

tions 702 and 703, and there would be no occasion to have recourse to those sections. The preamble of section 702(a) defines the field of coverage of subsections (a) and (b) of section 702 as situations in which a partner is "determining his [here its] income tax". That condition has arguably not been satisfied in this case because, as the concurrences and dissent point out, Brown Cayman has no U.S. income tax liability. Under a consistent application of their interpretative approach, we are therefore forced outside of subchapter K and thrown back to the common law of Federal taxation.[1] It seems to me that the cases cited and summarized at pp. 117–119 of the majority opinion are grounded in longstanding notions of mutual agency that antedate and transcend the argument whether the aggregate or entity theory of partnership is to prevail in a particular tax case that is governed by subchapter K.

If the issue is to be posed in terms of entity vs. aggregate, however, as the parties chose to do, it is appropriate to look to the intention of the applicable statutory provisions outside subchapter K (here, subpart F) for guidance about which approach is appropriate. See American Law Institute, Federal Income Tax Project, Subchapter K: Proposals on the Taxation of Partners 452, 523–532 (1984); Youngwood & Weiss, "Partners and Partnerships—Aggregate v. Entity Outside of Subchapter K", 48 Tax Law. 39, 40–43 (1994).[2]

The dissent uses inappropriate authorities to support its conclusion that the entity theory must be applied to reach what would properly be characterized as a "bizarre" result under subpart F. Youngwood & Weiss, *supra* at 40. Authorities which "determined that partnership level characteriza-

---

[1] The force of this observation is not blunted by sec. 1.952–2(a)(1) and (c), Income Tax Regs., which instructs us to determine the amount of gross income of a foreign corporation under subpt. F by treating it "as a domestic corporation taxable under section 11 and by applying the principles of section 61 and the regulations thereunder" and which do not include subch. K in the list of subchapters that do not apply in determining the applicability of subpt. F. By the express literal terms of the introductory language of sec. 702(a), subch. K does not apply for the purpose of determining the character under subpt. F of the income of a corporation that has no U.S. income tax liability, whereas sec. 702(c) arguably does apply for the purpose of determining the amount of a foreign corporation's gross income under subpt. F. Subch. K is therefore no impediment to the application of an aggregate approach under general principles of tax law, nor does it weaken the third leg of the majority's argument.

[2] Reliance on the good sense of judges to do the right thing should make it unnecesary to provide a presumption, by Code, regulation, or ruling, that the aggregate approach should generally be favored. The new partnership antiabuse regulations, sec. 1.701–2(h), Income Tax Regs., make clear that they do not limit the preexisting and continuing applicability of nonstatutory principles and other statutory and regulatory authorities to challenge transactions.

tion was necessary to ascertain matters such as the existence of a trade or business, the existence of a profit motive and the characterization of gain or loss with regard to partnership property", *id.* at 57, have no bearing on a case such as this, "where the character of the income must be determined at the level where the income is recognized", *id.*

It also bears pointing out that *United States v. Basye,* 410 U.S. 441, 448 (1973), quoted by the dissent as adopting the entity theory, does no more than illustrate that "it is not always possible for partnership income to be allocated to specific partners before it is included in income" and that "Any tax system that permitted * * * [an escrow] arrangement to defer the reporting of income would be fatally flawed. *Basye* simply recognized this principle in the partnership context." American Law Institute, Federal Income Tax Project, Subchapter K: Proposals on the Taxation of Partners 525 (1984).

Finally, in further support of the third leg of the majority opinion: As this writer observed in *Fort Howard Corp. v. Commissioner,* 103 T.C. 345, 377 n.2 (1994) (Beghe, J., dissenting), the logical relationship that should be focused on to establish the connection is "the 'logic of events' that has to do with cause and effect relationships and necessary connections or outcomes." In the case at hand, all Brinco income was earned commission income, and there is no difficulty in tracing Brown Cayman's distributive share of that income into its hands. There is no competing other kind of income or activity at the Brinco level that displaces to any extent the direct cause and effect relationship between the income-earning activities of Brinco's other partners and the characterization of Brown Cayman's distributive share of Brinco income derived from those activities.

SWIFT, *J.,* agrees with this concurring opinion.

---

CHIECHI, *J.,* concurring: Although I agree with the majority's holding that the income in question is foreign base company sales income under section 954(d)(1) and therefore is subpart F income includable under section 951(a) in the gross income of International, I cannot join in two of the three rationales upon which the majority relies to reach that holding. I concur only in the rationale set forth by the major-

ity under the heading *"Aggregate Versus Entity"*; that is to say, to effectuate the purpose of Congress in enacting subpart F, the aggregate nature of Brinco as a partnership must be emphasized in applying section 954(d)(1). That rationale amply supports the majority's conclusion that "Brown Cayman should be put into the shoes of Brinco for [purposes of] determining whether Brown Cayman was earning commission income on sales by third parties to International" (majority op. p. 119).

I cannot join in the ratio decidendi stated by the majority under the heading *"Subchapter K"* that relies on section 702(a)(7) and section 1.702–1(a)(8)(ii), Income Tax Regs., since, as pointed out by Judge Ruwe in his concurring opinion, that regulation, and therefore that section, does not technically apply because Brown Cayman, as a controlled foreign corporation, has no tax liability. Although Congress may well have intended that section 702(a)(7) apply in the circumstances presented here, that section requires that a partner take into account separately his distributive share of the partnership's other items of income, gain, loss, deduction, or credit only *"to the extent provided by regulations prescribed by the Secretary"* (emphasis added). The regulations prescribed by the Secretary (namely, section 1.702–1(a)(8)(ii), Income Tax Regs.) do not provide that Brown Cayman take such other items into account.

Nor can I join in the third rationale of the majority (and the only rationale in Judge Ruwe's concurring opinion) that is based on the language "in connection with" that appears in section 954(d)(1). To the extent the majority (and Judge Ruwe) suggests that rationale is separate from and independent of the ratio decidendi stated by the majority under the heading *"Aggregate Versus Entity"*, I disagree. It seems to me that Brown Cayman's distributive share of Brinco's profits cannot be characterized as "income * * * derived in connection with * * * the purchase of personal property from any person on behalf of a related person" unless the aggregate approach to Brinco were emphasized in order to give that share of those profits the same character in the hands of Brown Cayman as those profits have in the hands of Brinco, namely, commission income derived from the purchase of personal property on behalf of International. Sec. 954(d)(1). Only after the aggregate approach is applied

to pass through to Brown Cayman the character of those profits as such commission income can those profits be considered "derived in connection with * * * the purchase of personal property * * * on behalf of a *related person*", since Brown Cayman, and not Brinco, is a related person with respect to International. Sec. 954(d)(1) (emphasis added); see sec. 954(d)(3). The ratio decidendi stated by the majority under the heading "[*I*]*n connection with*" (and by Judge Ruwe in his concurring opinion) cannot, in my opinion, stand alone; it is wholly dependent on and results from the application of the aggregate theory of partnerships to Brinco.

---

JACOBS, *J.,* dissenting: I disagree with the majority's conclusion that Brown Cayman Ltd's. (Brown Cayman's) share of partnership income from Brinco is subpart F income; therefore, I respectfully dissent.

The majority relies on three reasons to reach the holding that the income in question is subpart F income: (1) A technical analysis under subchapter K of the Code; (2) application of the aggregate theory of partnerships; and (3) support from the language of section 954(d)(1). Judge Chiechi, in her concurrence, explains the flaw in two of these three reasons, namely, in reasons (1) and (3). In this dissent I explain why the remaining reason, reason (2) (the application of the aggregate theory of partnerships) is flawed.

The controversy involved in this case involves a controlled foreign corporation (Brown Cayman) that was a member of a partnership (Brinco) that earned income by acting as a commission purchasing agent on behalf of the parent (Brown Group International) of the controlled foreign corporation. In reaching its conclusion, the majority would disregard Brinco as an entity and treat Brown Cayman as if it had performed the activities of Brinco. I disagree. In my opinion, the existence of Brinco should be respected, and the commission income Brinco received should be characterized at the partnership level.

"Subpart F income", as defined under section 952(a), is the sum of four specifically defined types of income. Only one type of subpart F income, specifically "foreign base company income", is involved in this case. "Foreign base company

income", as defined under section 954(a), is the sum of five specifically defined types of income. Only one type of foreign base company income, specifically "foreign base company sales income", is involved in this case.

Section 954(d)(1) defines "foreign base company sales income" as follows:

SEC. 954(d). FOREIGN BASE COMPANY SALES INCOME.—

(1) IN GENERAL.—For purposes of subsection (a)(2), the term "foreign base company sales income" means income (whether in the form of profits, commissions, fees, or otherwise) derived in connection with the purchase of personal property from a related person and its sale to any person, the sale of personal property to any person on behalf of a related person, the purchase of personal property from any person and its sale to a related person, or the purchase of personal property from any person on behalf of a related person where—

(A) the property which is purchased (or in the case of property sold on behalf of a related person, the property which is sold) is manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized, and

(B) the property is sold for use, consumption, or disposition outside such foreign country or, in the case of property purchased on behalf of a related person, is purchased for use, consumption, or disposition outside such foreign country.

A "related person" is defined in section 954(d)(3), as in effect for the taxable year in issue, as follows:

(3) RELATED PERSON DEFINED.—For purposes of this section, a person is a related person with respect to a controlled foreign corporation, if—

(A) such person is an individual, partnership, trust, or estate which *controls* the controlled foreign corporation;

(B) such person is a corporation which *controls,* or *is controlled by*, the controlled foreign corporation; or

(C) such person is a corporation which is *controlled by* the same person or persons which *control* the controlled foreign corporation.

For purposes of the preceding sentence, control means the ownership, directly or indirectly, of stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote. For purposes of this paragraph, the rules for determining ownership of stock prescribed by section 958 shall apply.

[Emphasis added.]

Here, there is no question but that Brown Cayman is a controlled foreign corporation and that Brown Group International is a U.S. shareholder of a controlled foreign corporation. Thus, Brown Group International (and ultimately the

affiliated group of which it is a member) must include in income the foreign base company sales income earned by Brown Cayman. But, as hereafter explained, Brown Cayman did not have foreign base company sales income.

In the elaborate detailing of section 954(d)(1), Congress required that, in order for a controlled foreign corporation to have foreign base company sales income, each of the following elements must be present: (1) A purchase or sale, (2) of personal property, (3) from, to, or on behalf of a related person, and (4) such personal property must be manufactured outside the controlled foreign corporation's country of incorporation, and (5) the sale must be for use, consumption, or disposition outside such controlled foreign corporation's country of incorporation. In the instant case four of the five elements are present, namely, the first two and last two elements. But the third element is not present because the purchase of the footwear was not made from, to, or on behalf of a related person. Rather, the purchase in this case was arranged by Brinco from third parties on behalf of Brown Group International, a party unrelated to Brinco.

As to the third element, the majority does not claim there was a purchase of personal property from or to related parties. Rather, the majority asserts that there was a purchase on behalf of a related person by treating Brown Cayman as if it did the purchasing of footwear, through Brinco, on behalf of Brown Group International.[1] The majority's assertion is erroneous because Brinco is not a sham. In fact, it is undeniable that Brinco was formed and structured as a partnership, at least in part, for substantial business purposes. Further, the form of all of the partnership's (Brinco's) transactions involved reflect their substance.

For tax purposes, there are two different ways of viewing a partnership. A partnership may be viewed as an aggregation of its partners, each of whom directly owns an interest in partnership assets and operations, or as a separate entity,

---

[1] See majority op. p. 120, wherein the majority states:

Finally, we wish to dispose of one argument made by petitioner: viz, that, for the year in question, Brinco was not a related person with regard to Brown Cayman or International. That is true; nonetheless, it is irrelevant. Nothing here turns on whether Brinco is a related person with regard to either Brown Cayman or International. We are dealing here with that part of the definition of foreign base company sales income that involves "the purchase of personal property from any person on behalf of a related person". Sec. 954(d)(1). The inquiry is whether Brown Cayman, through Brinco, purchased footwear on behalf of International. * * *

in which separate interests are owned by each of its partners. By disregarding Brinco, the majority uses an aggregate partnership approach. Using the aggregate approach, the majority attributes the partnership's (Brinco's) activities, and not merely the character of the partnership income, to its partner (Brown Cayman).

It is noteworthy that in defining a related person, section 954(d)(3) provides that a partnership that controls a foreign corporation is a related person, and thus the income derived in connection with the purchase or sale of personal property between the two entities (that is, the controlling partnership and controlled foreign corporation) is treated as foreign base company sales income. Had Congress viewed a partnership as an aggregation of its partners (rather than as a separate entity), then there would have been no need to include a partnership in the definition of a related person. Instead, the determination of a related person would be made separately as to each partner depending on whether that partner was related to the entity with whom the partnership purchased or sold personal property.

As stated, I believe the majority's aggregate approach is erroneous. The process of characterizing partnership income, for tax purposes, is a two-part process: First, the partnership is treated as an entity in whose hands the partnership income is characterized, and then the partnership is treated as a conduit (an aggregate concept) through which the income received is passed on to the partners in accord with their distributive shares. Treating the partnership (Brinco) as an entity in whose hands the commission income is to be characterized produces a result that the income in question is not foreign base company sales income, and hence is not subpart F income.

No court has addressed the issue of whether, in the context of subpart F of the Code, section 702(b) should be interpreted as determining the character of income at the partner level (aggregate approach) or at the partnership level (entity approach). However, as will be later discussed, regulations issued on December 30, 1994, permit the Internal Revenue Service (Service) to treat, in certain situations, a partnership as an aggregation of its partners, in whole or in part, as appropriate to carry out the provision of the Code or regulations thereunder with respect to transactions that occur on

or after December 30, 1994. The transactions involved herein occurred prior to that date.

For the most part, the cases that have directly considered whether partnership items should be characterized at the partner or partnership level have generally concluded that the characterization question should be resolved at the partnership level. See 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 9.01[4][a], at 9–19 (2d ed. 1990) (the authors also note that partnership-level characterization is virtually required by the overall sense of the partnership taxation statutory framework).

The U.S. Supreme Court has stated that, for purposes of calculating partnership income, "the partnership is regarded as an independently recognizable entity apart from the aggregate of the partners". *United States v. Basye,* 410 U.S. 441, 448 (1973). The Court also noted:

The legislative history indicates, and the commentators agree, that partnerships are entities for purposes of calculating and filing informational returns but that they are conduits through which the taxpaying obligation passes to the individual partners in accord with their distributive shares. [*Id.* n.8; citations omitted.]

Recent cases cite *United States v. Basye, supra,* in holding that characterization of partnership income derived from the sale of property takes place at the partnership level. For example, in *Pleasant Summit Land Corp. v. Commissioner,* 863 F.2d 263 (3d Cir. 1988), affg. in part and revg. in part T.C. Memo. 1987–469, the Court of Appeals upheld our factual finding that the sale of real estate held by a partnership was properly characterized as a capital gain. In holding that such characterization takes place at the partnership level, the Court of Appeals quoted *Basye* and concluded: "we must make our analysis of the investment from the point of view of the partnership". *Id.* at 272.[2]

In *Barham v. United States,* 301 F. Supp. 43 (M.D. Ga. 1969), affd. 429 F.2d 40 (5th Cir. 1970), the District Court held that, where the trade or business of a joint venture was the purchase, development, and sale of real estate, the partner-taxpayer's distributive share of income received from the

---

[2] See also *Simon v. Commissioner,* 830 F.2d 499, 506–507 (3d Cir. 1987) (determination of whether an expense is deductible is dependent upon partnership's motive, not by an individual's purpose in joining the partnership), affg. T.C. Memo. 1986–156.

sale of real estate was not entitled to capital gain treatment even though the partner was not engaged in the real estate business. *Id.* at 46–49.[3] The court referred to section 702(b) as the "conduit rule" and stated:

The clear inference to be drawn from the Code sections and the regulation is that, as a general rule, for the purpose of determining the nature of an item of income, deduction, gain, loss or credit * * * the partnership is to be viewed as an entity and such items are to be viewed from the standpoint of the partnership (or joint venture) rather than from the standpoint of each individual member. * * * [*Id.* at 46.]

The court added:

It follows that in section 1221(1) the words "his trade or business" mean the trade or business of the partnership, even though under section 701 partnerships are not liable for income tax. * * * [*Id.*]

In *McManus v. Commissioner,* 583 F.2d 443 (9th Cir. 1978), affg. 65 T.C. 197 (1975), the Court of Appeals affirmed this Court's holding that a section 1033 election must be made at the partnership level. The Court of Appeals rejected the taxpayer's argument that the partnership was not a taxable entity, stating:

While it is true that a partnership is not liable for tax * * * [it] is required to file returns and the partners are required to conform their individual returns to the partnership returns. If each partner could determine his share of the partnership income separately, confusion would result, confusion which Congress meant to avoid * * * [*Id.* at 448; citation omitted.]

In *Davis v. Commissioner,* 74 T.C. 881 (1980), affd. 746 F.2d 357 (6th Cir. 1984), we held that the special allocation to a partner-taxpayer of royalties paid to the partnership retains its character as a capital gain under section 631(c) in the hands of the taxpayer. We reviewed section 702(b) and stated: "This language has been consistently interpreted to mean that the character of partnership income is determined at the partnership level". *Id.* at 905–906 (citing *United States v. Basye,* 410 U.S. 441 (1973); *Podell v. Commissioner,* 55

---

[3] See also *Estate of Freeland v. Commissioner,* 393 F.2d 573, 584 (9th Cir. 1968) ("it is the intent of the partnership, and not of any individual partner, that is in issue according to the Internal Revenue Code"), affg. T.C. Memo. 1966–283; *Podell v. Commissioner,* 55 T.C. 429, 431–434 (1970) (holding that joint venture arrangement was to be treated as a partnership for tax purposes and that the character of real estate sales income was determined at the partnership level); *Stivers v. Commissioner,* T.C. Memo. 1973–244 (holding that the character of gains from sales of real estate by partnership was to be determined at the partnership level).

T.C. 429 (1970); *Grove v. Commissioner,* 54 T.C. 799 (1970); sec. 1.702–1(b), Income Tax Regs.).

This Court and several Courts of Appeals have addressed the issue of profit motive, for purposes of section 162, with respect to partnerships. All have held that such characterization is to be made at the partnership level. For example, in *Brannen v. Commissioner,* 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982), the court held that, in determining whether a partner-taxpayer was entitled to any claimed deductions which were attributable to cash paid by the partnership for a movie, the profit-motive analysis was properly made at the partnership level.[4]

In *Goodwin v. Commissioner,* 75 T.C. 424 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982), this Court also held that profit motive under section 162 is properly applied at the partnership level, and we noted that section 702(b) "has been held to require that the character of the items comprising the partnership income or loss be determined at the partnership level". *Id.* at 436 (citing *Davis v. Commissioner,* 74 T.C. 881, 905–906 (1980), affd. 746 F.2d 357 (6th Cir. 1984); *Miller v. Commissioner,* 70 T.C. 448, 455–456 (1978); *Podell v. Commissioner,* 55 T.C. 429, 432–434 (1970); *Grove v. Commissioner,* 54 T.C. 799, 803–805 (1970)). In *Goodwin v. Commissioner, supra* at 437, we then concluded: "that in the context of section 162, the character of the deductions, i.e., whether they were incurred in the course of a trade or business, must be resolved at the partnership level."

In addition, in *Campbell v. United States,* 813 F.2d 694 (5th Cir. 1987), the court held that the attribution of a loss to a trade or business for the purposes of section 172(d)(4) (which allows certain business deductions in calculating a net operating loss) must be made at the partnership level: "We have held that under section 702(b), partnership business deductions may be attributed to the individual partner-

---

[4] See also *Polakof v. Commissioner,* 820 F.2d 321, 323 (9th Cir. 1987) ("We agree with the Fifth and Eleventh Circuits that it is the dominant economic motive of the partnership, not that of the individual investors, that is determinative."), affg. T.C. Memo. 1985–197; *Tallal v. Commissioner,* 778 F.2d 275, 276 (5th Cir. 1985) ("When the taxpayer is a member of a partnership, we have interpreted section 702(b) to require that business purpose must be assessed at the partnership level."), affg. T.C. Memo. 1984–486; *Madison Gas & Elec. Co. v. Commissioner,* 633 F.2d 512, 517 (7th Cir. 1980) (expenses characterized as "pre-operational costs" of partnership even though general partner was already in the same business), affg. 72 T.C. 521 (1979).

taxpayer only if such deductions were incurred in the partnership's trade or business". *Id.* at 695–696 (citing *Tallal v. Commissioner,* 778 F.2d 275, 276 (5th Cir. 1985), affg. T.C. Memo. 1984–486).

In *Resnik v. Commissioner,* 66 T.C. 74, 81 (1976), affd. per curiam without published opinion 555 F.2d 634 (7th Cir. 1977), we concluded that, under section 446(b), we must "first look at the partnership level to ascertain whether the prepayment of interest results in a distortion of income". In so concluding, we reasoned:

> The partnership return is more than just an information return. It has consequences that go beyond the mere disclosure to the Commissioner of profits of the enterprise * * * And in computing its net income under the revenue laws, it is generally the partnership, not the individual partner, that exercises the various options open to taxpayers in computing net income under the Code. * * * [*Id.* at 80–81 (quoting *Scherf v. Commissioner,* 20 T.C. 346, 347–348 (1953)).]

In Rev. Rul. 68–79, 1968–1 C.B. 310, the Service characterized as long-term capital gain a partner's distributive share of capital gain upon the sale of securities because, even though the partner held his partnership interest for less than 6 months, the partnership held the securities longer than the requisite holding period. The ruling stated:

> The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (8) of section 702(a) of the Code is determined at the *partnership level.* [Rev. Rul. 68–79, 1968–1 C.B. at 310; emphasis added; citation omitted.]

Similarly, the Service has ruled that characterization of ordinary loss under section 1231 must take place at the partnership level. Rev. Rul. 67–188, 1967–1 C.B. 216. Likewise, in Rev. Rul. 77–320, 1977–2 C.B. 78, the Service expressed the position that section 183 applies to partnerships at the partnership level.

In nearly every context in which the issue of characterization of partnership income is relevant to the facts of this case, this Court and other courts have concluded that the proper level for characterizing an item of income is at the partnership level. Applying the logic of these cases to the determination of foreign base company sales income, I would apply the entity theory of partnership taxation; that is, I would characterize the income involved herein at the part-

nership (Brinco's) level. As a consequence, I would conclude that the income in question is not subpart F income.

I recognize that acceptance of my position will result in petitioner's receiving a tax windfall because 100 percent of the commissions paid to Brinco by Brown Group International would be included in its cost of goods sold, whereas 88 percent of the commissions (which ultimately went to Brown Cayman) would not be taxed. But as the Court of Appeals for the Ninth Circuit has stated:

The Government asserts that in enacting subpart F Congress was more concerned with the nature of the income than the form of the entity generating the income * * *

We find this argument unpersuasive. * * * Congress wrote the statute unambiguously to apply to subpart F income received from controlled "corporations" only. If the omission of income received from controlled partnerships has indeed created an unjustified loophole in the tax laws, the remedy lies in new legislation, not in judicial improvisation.

[*MCA Inc. v. United States,* 685 F.2d 1099, 1104–1105 (9th Cir. 1982).]

Petitioner may have found a hole in the dike, but the closing of the hole "calls for the application of the Congressional thumb, not the court's." *Fabreeka Prods. Co. v. Commissioner,* 294 F.2d 876, 879 (1st Cir. 1961), vacating and remanding 34 T.C. 290 (1960); see *Hanover Bank v. Commissioner,* 369 U.S. 672, 688 n.23 (1962). The Service may have closed the hole in the dike for partnership transactions that occur on and after December 30, 1994, but here, as previously stated, the transactions involved occurred prior to that date.

On December 30, 1994, the Service issued final regulations, section 1.701–2, Income Tax Regs., 60 Fed. Reg. 27 (Jan. 3, 1995), providing for an antiabuse rule under subchapter K of the Code. The rule permits the Service, in certain instances, to recast partnership transactions that make inappropriate use of the rules of subchapter K. In addition, and more pertinent to this case, section 1.701–2(e), Income Tax Regs., provides that the Service can treat a partnership as an aggregation of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Code or regulations thereunder, except to the extent that: (1) A provision of the Code or regulations prescribes the treatment of the partnership as an entity, and (2) that treatment and the ultimate tax results, taking into account all the rel-

evant facts and circumstances, are clearly contemplated by that provision.

The antiabuse rule is effective for all transactions involving a partnership that occur on or after May 12, 1994. The provisions permitting the Service to treat a partnership as an aggregation of its partners as appropriate to carry out the purpose of any provision of the Code are effective for all transactions involving a partnership that occur after December 29, 1994. The transactions involved herein occurred prior to November 2, 1986, and Brinco was dissolved on October 31, 1987.

CHABOT and LARO, *JJ.*, agree with this dissent.